271 N.J. Super. 359 (1994)
638 A.2d 898
PAUL R. MELLETZ, PLAINTIFF-APPELLANT,
v.
ELSA W. MELLETZ, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued January 19, 1994.
Decided March 15, 1994.
*360 Before Judges PRESSLER, DREIER and BROCHIN.
Steven B. Sacharow argued the cause for appellant (Sacharow, Adler, Gold, Taylor & Keyser, attorneys; Mr. Sacharow on the letter brief and Barbara J. Snavely, on the brief).
Gary L. Borger argued the cause for respondent (Lisa L. Ulrich, on the brief).
The opinion of the court was delivered by DREIER, J.A.D.
*361 Plaintiff appeals from a post-judgment matrimonial order, entered after a plenary hearing, denying his motion to suspend alimony payments because of defendant's alleged cohabitation with a male friend. Judge Grasso determined that the cohabitation clause in the parties' settlement agreement was unfair, inequitable and unenforceable, and thus refused to suspend plaintiff's alimony obligation. However, as the clause was a material aspect of the settlement agreement, the judge decided that the agreement could now be renegotiated if plaintiff so desired.
The parties were divorced on November 13, 1991, and negotiated a settlement agreement which was incorporated into the final judgment of divorce. Under the agreement, defendant was to receive alimony in the amount of $400 a week, but the alimony payments would terminate upon the death of either party or upon defendant's remarriage, and would be suspended for any period during which defendant cohabited with an unrelated male. The cohabitation provisions read as follows:
Husband's alimony obligation shall be suspended during the period of cohabitation if the wife cohabits with a male unrelated to her by blood or marriage. Cohabitation for the purposes of this agreement, shall be defined as the wife and the unrelated male (hereinafter "male") generally residing together in a common residence, or residences where they generally engage in some, but not necessarily all, of the following:
(a) Meals taken together at the residence(s);
(b) Departing from and returning to the residence of the other for employment and/or social purposes;
(c) Maintaining clothing at the other's residence;
(d) Sleeping together at the residence or the residence of the other;
(e) Receiving telephone calls at the residence or the residence of the other.
The occurrence of any of the following shall not defeat cohabitation as the parties have defined that term herein:
(a) Temporary interruptions of the relationship shall not defeat a claim of cohabitation;
(b) Alternating of residences;
(c) Maintenance of a separate residence by the male.
The parties have expressly agreed that the purpose of this provision was specifically negotiated for, and represents the end product of, a bargained for *362 agreement. Specifically, the parties intend that the economic contribution component of Gayet shall not be applicable and the mere cohabitation, as defined herein, shall be the basis for suspension of the husband's alimony obligation.
Wife represents that she is not currently cohabiting and if that representation is false, the husband shall have the right to reimbursement of alimony paid during cohabitation. In the future, if it is determined that wife is cohabiting, any relief would be retroactive to the date cohabitation commenced.
Since the judge found the provisions unenforceable, he made no factual determination whether the parties were cohabiting under the standards of the agreement.
At the November 13, 1991 hearing on the divorce, the parties were questioned regarding the settlement agreement. Defendant testified that she had gone through each of the terms of the agreement with her attorney, that she understood the terms, that she was entering into the agreement voluntarily and that she accepted the terms of the agreement as fair and equitable. The judge subsequently determined that the agreement had been entered into voluntarily and that it was "believed to be fair and equitable under all the circumstances of this case with both parties being represented by counsel." The judge, however, made no finding as to the reasonableness of the agreement.
On October 11, 1991, over a month prior to the divorce, plaintiff, his then-fiancee (now his wife) and one of her friends began surveilling defendant's condominium unit. Eventually, plaintiff also hired two private investigation firms to watch defendant. Plaintiff was thus aware of defendant's relationship with a male friend, Mr. "C," prior to the November 13, 1991 negotiation. In fact, at the plenary hearing, plaintiff testified that the cohabitation clause was designed "to stop what [was] going on." Defendant testified that she was aware of the allegations of her cohabitation at the time of the agreement, but that she did not contemplate that her relationship constituted cohabitation under the agreement. We note parenthetically that plaintiff has lived with his present wife since shortly after separating from defendant in March of 1989.
*363 It is undisputed that defendant and her friend had a relationship. The trial judge found the following:
During this period [August 30, 1991 through November 1991], the defendant-wife maintained a social or dating relationship with an individual identified as [Mr. C.]. At all times material, the defendant-wife and [the friend] maintained separate residences but socialized and dated by engaging in such activities as shopping, going out to restaurants, eating meals at the residence of the other and remaining over night with each other. The defendant-wife, during her testimony recalled at least ten overnight stays by [the friend] at [defendant's] new condominium in Mount Laurel, New Jersey. Both the defendant-wife and [the friend], during their testimony, described their relationship as "just dating" and as a warm friendship.
Plaintiff maintains that defendant and her friend were "cohabiting" as that term is defined in the settlement agreement.
As noted in a different setting in Aronson v. Aronson, 245 N.J. Super. 354, 364, 585 A.2d 956 (App.Div. 1991):
Alimony is neither a punishment for the payor nor a reward for the payee. Nor should it be a windfall for any party. It is a right arising out of the marriage relationship to continue to live according to the economic standard established during the marriage as far as economic circumstances will allow.
In New Jersey, the test for determining whether cohabitation by the dependent spouse should reduce an alimony award has always been based on a theory of economic contribution. In Gayet v. Gayet, 92 N.J. 149, 150, 456 A.2d 102 (1983), the Supreme Court definitively ruled that the test for modification of an alimony award in a cohabitation case was "whether the relationship has reduced the financial needs of the dependent former spouse." The Court found that a supporting spouse is entitled to a modification "only if one cohabitant supports or subsidizes the other under circumstances sufficient to entitle the supporting spouse to relief." Id. at 153-54, 456 A.2d 102. See also Pugh v. Pugh, 216 N.J. Super. 421, 524 A.2d 410 (App.Div. 1987); Wertlake v. Wertlake, 137 N.J. Super. 476, 349 A.2d 552 (App.Div. 1975); Garlinger v. Garlinger, 137 N.J. Super. 56, 347 A.2d 799 (App.Div. 1975); Eames v. Eames, 153 N.J. Super. 99, 379 A.2d 67 (Ch.Div. 1976); Grossman v. Grossman, 128 N.J. Super. 193, 319 A.2d 508 (Ch.Div. 1974); Edelman v. Edelman, 124 N.J. Super. 198, 305 A.2d 804 (Ch.Div. 1973); and Suozzo v. Suozzo, 16 N.J. Misc. 475, 1 A.2d 930 *364 (Ch. 1938). This has been the law for at least fifty-five years. The Court in Suozzo stated
that as a matter of law, if not logically, unchastity of a former wife is not a defense to her right to alimony after absolute divorce, nor justification for retracting an award previously made to her under our statute. It is, at most, a factor that in a proper case may be considered as bearing upon the amount of, and the necessity for the allowance.

Id. at 477, 1 A.2d 930.
More recently in Pugh v. Pugh, supra, we were confronted with a property settlement agreement in which the parties agreed that the defendant-wife would have to sell the marital home in the event she lived there with an unrelated male. Plaintiff-husband subsequently tried to compel a sale of the home based on defendant's alleged cohabitation. Defendant admitted that "a nonrelated adult male" spent three weekends a month and at least one day a week at the home. We held, however, that this did not constitute cohabitation. In making this determination, we again focused on the economic impact of the relationship:
[T]he agreement should be regarded as having principally an economic purpose, that is, to assure that plaintiff's interest in the former marital home is not used to subsidize defendant's relationship with a male cohabitant.

Pugh, supra, 216 N.J. Super. at 425, 524 A.2d 410.
Thus we were able to rely upon contractual interpretation, and were not faced with the question of whether parties could vary the parameters of the economic contribution rule by contract. We stated:
We are disinclined to apply the contract language in a way which conflicts with our stated public policy to guarantee individual privacy, autonomy, and the right to develop personal relationships.

Id. (citing Gayet, supra, 92 N.J. at 151, 456 A.2d 102).
In the case before us the parties recognized the rule in Gayet, and, specifically citing it, stated in so many words that they wished to reject it. ("Specifically, the parties intend that the *365 economic contribution component of Gayet shall not be applicable and the mere cohabitation, as defined herein, shall be the basis for suspension of the husband's alimony obligation".) Under the agreement, plaintiff is entitled to suspend his payment of alimony if defendant cohabits, regardless of the economic impact of such cohabitation.[1]
We faced a similar issue in Morris v. Morris, 263 N.J. Super. 237, 622 A.2d 909 (App.Div. 1993) in determining whether a clause specifically rejecting the ability/needs modification tests of Lepis v. Lepis, 83 N.J. 139, 416 A.2d 45 (1980) would be enforced. The parties there provided "that the modification provisions of Lepis would not apply," 263 N.J. Super. at 243, 622 A.2d 909, and substituted their own standards for the modification of their agreement for the usual need and ability to pay standards of Lepis. We determined in Morris that where there was no inequity, we would enforce the parties' standards. We stated
that the parties can establish their own standards, and that these standards, where not unwarranted under the circumstances, will be enforced by the court irrespective of the need-based guidelines of Lepis, which are applied when there are no such standards. If circumstances have made the parties' standards unreasonable, they can in extreme cases be modified.

Id. at 245-246, 622 A.2d 909.
We note, however, that Morris v. Morris involved only economic issues. The parties there did not endeavor to control each others' conduct following the divorce, on pain of grievous economic impact. Here the one-sided agreement attempts to control the wife's behavior in terms of suspension of her total alimony, even though the prohibited behavior may have no economic impact on her life. This is basically an in terrorem clause seeking to regulate the ex-wife's otherwise legal activities. We could even consider a hypothetical mirror image of this case. If the wife agreed to one-half *366 of the alimony justified by the parties' circumstances on condition that the husband refrain from similar behavior, would such a clause have a different legal consequence from the one before us? We think not.
We could attempt to analyze this case on the basis of the wife's alleged misunderstanding of the agreement's standard of "generally residing together in a common residence, or residences," as opposed to the husband's reliance upon instances of the five types of conduct which are the stated indicia of such cohabitation. But perhaps it is time to face the problem squarely, as did the trial judge. Should the law be concerned with enforcement of agreements by which a payor divorced spouse attempts to control the payee's behavior that has no economic impact on the payor or other effect in an area of recognized mutual concern?[2] For example, can a payor require that alimony payments to which the payee spouse is statutorily entitled will be made only so long as the payee dyed his or her hair a particular color, or lived in a particular neighborhood, or engaged in a particular occupation? Matters of personal preference, residence, or occupation, insofar as they do not reflect changes in income or expenses or other matter of recognized mutual concern, simply are not the business of a former spouse. They do not relate to the payee's right to adequate support. Nor in the usual case are the courts inclined to apply precious resources to the enforcement of or adjudicating the breach of such agreements. So too with matters of cohabitation. It is enough that we must monitor the economic impact of *367 cohabitation allegations or resolve other matters of the parties' continuing mutual concern.
We therefore hold that, apart from the economic impact upon either need or the ability to pay recognized in Gayet v. Gayet and the other cited cases or other matters of recognized mutual concern, the payor spouse may not through loss or suspension of statutory alimony control the social activities of the payee.[3] If the issue involves conduct, legal for the participants, but detrimental to children in the household, the parties may, of course, agree on generally-recognized standards of social behavior. But these issues are non-economic and cannot be used for economic coercion. The divorce cuts the ties that permit one spouse to control the other's behavior where their respective economic rights and responsibilities or other matters of recognized continuing mutual concern are not implicated.[4]
In this case allowing plaintiff to attach conditions to defendant's receipt of her statutorily mandated alimony which are unrelated to her financial status would contravene the very purpose of alimony. See Aronson v. Aronson, supra, 245 N.J. Super. at 364, 585 A.2d 956.
*368 Plaintiff's motivation was made clear when he admitted that the clause was "to stop what [was] going on." We also see the impact that a clause such as this one had on defendant when she testified that she wouldn't "dare go out with anybody anymore because I would never ever put any other man in the circumstances that [Mr. C.] was put into." In fact, both defendant and her friend testified that their relationship was over, presumably because of the strain of this litigation. Judge Grasso properly found that
the defendant is rendered social and economic hostage of the property settlement agreement. The agreement leaves very little latitude for the defendant to engage in even a casual or social relationship without fear of losing her economic support....
The social impact in this case demonstrates why such clauses effecting a complete loss of alimony should be unenforceable. Courts are only required to enforce property settlement agreements to the extent that they are fair, equitable and just. Petersen v. Petersen, 85 N.J. 638, 642, 428 A.2d 1301 (1981). Cohabitation clauses beyond the economic contribution standards of Gayet or other recognized matters of mutual concern fall short of this standard and will not be enforced.
There is a second issue in this case which must be addressed and which was recognized by the trial judge. The parties clearly bargained for the clause in question, and it well may be that some consideration was paid beyond the normal alimony that the wife would have received. It would be unfair for us to find the clause unenforceable, yet let the wife retain any additional alimony which may have been paid for the provision. Judge Grasso properly determined that as the clause was to be overturned, the parties must be given an opportunity to renegotiate their agreement or else submit the matter to the court for adjudication. We would merely add to his statement that the wife should receive no less than the alimony that would have been awarded had the anti-cohabitation clause not been included in the agreement.
The order appealed from is affirmed, and the matter is remanded for the trial judge to supervise the renegotiation of the agreement and any trial that may ensue.
*369 BROCHIN, J.A.D. (concurring).
I agree with my colleagues that without proof of some special justification or the dependent spouse's receipt of some sufficiently valuable consideration in addition to what she would be entitled to in any event, the anti-cohabitation agreement at issue here is unconscionably restrictive and therefore unenforceable. Furthermore, I also recognize that in one footnote the majority opinion leaves open the possibility that courts may enforce some agreements between divorcing spouses about subjects which are not "recognized matters of mutual concern." (See fn. 4.) Read as a whole, however, the majority opinion strongly asserts that otherwise legal agreements will be unenforceable because they have been entered into by divorcing spouses and deal with what the court considers inappropriate subject matter. That proposition is unnecessary to the decision of this case and, in my view, is incorrect. I therefore join only in the result of the court's decision.
NOTES
[1] Plaintiff is currently paying alimony in the amount of $400 a week. There was no evidence of the alimony that would have been due defendant in the absence of the cohabitation clause. Therefore neither we nor the trial judge could determine whether defendant received additional consideration by way of increased alimony for agreeing to the cohabitation clause.
[2] The law recognizes mutual concern in areas of commonly owned property, usually the former marital home the sale of which may be postponed until the children's emancipation, matters affecting the parties' children, and the like. For example, a husband could pay additional sums to his ex-wife to induce her to remain in an area of New Jersey where the ease of visitation would be enhanced. He also could pay her increased alimony as an inducement not to take a full time job so that she could be more available to their children. Such additional payments, however, must be reasonably related to the costs so that these can be a basis for objective evaluation if they are terminated.
[3] It might be thought that since alimony is based upon the ability of the payor and the need of the payee in order to maintain the payee at the standard of living established during the marriage, that the payee could reduce this standard of living and apply the difference in income to support a paramour. Gayet and the other cited cases certainly do not stand for such a proposition. See Gayet, supra, 92 N.J. at 155, 456 A.2d 102; Pugh v. Pugh, supra, 216 N.J. Super. at 426, 524 A.2d 410; Garlinger v. Garlinger, 137 N.J. Super. at 63, 347 A.2d 799. Also the rule has been established in these cases that where the payee and a paramour share a residence, the support of or by the paramour is presumed, thus implicating an economic impact. While the parties here may have intended to bring defendant within the rule of these cases, the indicia of a common residence were expanded here beyond reason.
[4] We do not here reach the issue of whether in an unusual situation counselled competent adults may contract for specific other conduct on the part of the exspouse, provided that the payor does not reduce the alimony that would otherwise have been awarded pursuant to the statute.