709 A.2d 829

JOSEPH A. SAVARESE, PLAINTIFF, v. THERESA M. CORCORAN, DEFENDANT.

Superior Court of New Jersey
Chancery Division
Family Part
Monmouth County

Decided April 30, 1997.

*Edward L. Larsen* for plaintiff (*Edward L. Larsen, P.C.*).

*George G. Whitmore* for defendant (*George G. Whitmore, P.A.*).

HAYSER, J.T.C., temporarily assigned.

Defendant brought a motion seeking, among other things, an increase in child support for the two children of the marriage. The motion was denied on January 31, 1997, the court having found that the anti-*Lepis* clause inserted in a post judgment agreement between the parties was valid. Thereafter, defendant filed the present motion for reconsideration.

On November 10, 1986, a Final Dual Judgment of Divorce was entered. Provision was made for the sale of the marital home, alimony and child support under the Property Settlement Agreement (PSA) dated October 27, 1986 and incorporated therein.

Under Paragraph 7 of the PSA, the marital residence was to be listed for sale in or about March, 1992, with no closing to take place prior to July 1, 1992. Until the sale, the plaintiff was required to pay the mortgage, real estate taxes and homeowner's insurance. (Paragraph 9)

While the defendant resided in the marital residence she was to receive alimony payments in the amount of $7,000 per year, payable monthly in the amount of $583.33. (Paragraph 10A) If the marital residence was sold before September 1, 1992, the alimony payments would increase to $13,000 per year, payable monthly in the amount of $1,083.33. (Paragraph 10B)

Child support was to be paid by the plaintiff in the amount of $7,000 per year, payable monthly in the amount of $583.00, which on September 1, 1992 was to increase to $15,000 per year, or $1,250 per month. (Paragraph 12)

On October 21, 1988, the parties executed a post judgment agreement. The agreement acknowledged that "both of the ... parties are desirous of modifying the Property Settlement Agreement that they had entered into without the process of going into Superior Court and desire that the modification be promptly completed."

Among other things, the agreement provided that the plaintiff would transfer his interest in the marital residence to the defendant, "in lieu of future alimony due and payable to Theresa Savarese ... equivalent to a lump sum payment." (Paragraph 1) [1] The agreement also provided for continued child support to be paid by the plaintiff in the amount of $500 per month, and the defendant was "prohibited from seeking a modification of the child support payments at any future date" and "waives her right to seek any modification of the child support payments." (Paragraph 2) Furthermore, "[i]n lieu of any cost of living expense increases in the amount of child support ... Joseph A. Savarese will place the sum of 5% per year of the total child support in a[sic] interest bearing bank account for the benefit of his two children of the marriage." (Paragraph 5)

Under *Lepis v. Lepis,* 83 *N.J.* 139, 416 *A.*2d 45 (1980), a party may seek modification of a child support obligation under its

---

[1] The parties agree that at the time of transfer, the marital residence had a total equity of $160,000.

ability/needs tests by demonstrating that circumstances have changed in such a way as to make the existing payment provision inequitable. *Id.* at 152 and 157, 416 *A.*2d 45. Defendant asserts a number of reasons in her contention that the "anti-*Lepis*" provision of Paragraph 2 of the post judgment agreement is invalid:

1. The defendant did not have the benefit of adequate counsel prior to the modification of the property settlement agreement.

2. There was a significant change in circumstances that warrants a modification in the child support.

3. The defendant did not have the legal right to bargain away child support.

4. There was no consideration for the child support waiver and thus, it should be held unenforceable.

5. That under the holding in *Bengis v. Bengis,* 227 *N.J.Super.* 351 [547 *A.*2d 701] (App.Div.1987), any detriment to the children now warrants a modification of the child support payments required under the post judgment agreement even if the anti-*Lepis* clause is valid.

Before considering the defendant's arguments, a number of additional facts should be indicated. Subsequent to their divorce, both parties remarried, and each has custody of two children, with the defendant being the custodial parent of the children of the parties' marriage. The parties, and their spouses, have been employed. Finally, since the post judgment agreement was executed, the plaintiff has transferred his interest in the former marital residence to the defendant, and has paid the required child support under that agreement.

## I. ADEQUACY OF COUNSEL

The defendant claims that the post judgment agreement should be set aside since she lacked adequate counsel when agreeing to its terms.

During the pendency of this matter, the defendant was deposed on January 16, 1997, at which time she discussed her conversation with her previous attorney as to the 1988 post judgment agreement:

A: ... My mom paid for my original attorney. I was just starting a new position, a new job, and I basically had—I called my original attorney and he said it's $2500 to sit in front of me again, so I really didn't want to do that, so I said he

is offering me the house and at a much lower child support figure. . . . I said should I do it, and he said you're crazy. No, it's a bad deal. No, you should not do it.
Q: And when you said he, referring to your attorney, that was the attorney who represented you in the divorce?
A: Yes.
Q: And his name was?
A: Philip Jacobowitz.
[T8–14 through 19, 21 through 23]

Defendant also testified at her deposition that she had a real estate attorney prepare the written draft of the parties' agreement as she gave it to him and that he provided her with no advice. T13–22 through 14–25.

It is undisputed that neither party had an attorney to represent them in the negotiations of the post judgment agreement, concluded without recourse to court intervention. However, it is also undisputed that the defendant consulted with her former divorce attorney, a leading matrimonial attorney, who advised her not to enter into such an agreement. Nevertheless, rather than seeking any necessary enforcement of the existing PSA, she concluded the new agreement.

Under the circumstances there is no similarity between this situation and that, as defendant argues, in *Guglielmo v. Guglielmo,* 253 *N.J.Super.* 531, 542, 602 *A.*2d 741 (App.Div.1992), wherein the wife was represented by a relative of her husband. Whatever was lacking in the formality of their present attorney/client relationship, the clarity of her former divorce attorney's advice is beyond question, as even the defendant acknowledges.

## II. CHANGE IN CIRCUMSTANCES

Further in her deposition of January 16, 1997, the defendant was questioned as to her claim of "changed circumstances" warranting an adjustment in child support:

Q: All right. Has anything changed within the last year that caused you to seek an upward modification of child support at this time?

A: Well, several things come to mind. My own awareness of the situation. I'm forcing myself to read through the documents and become more aware of what I originally agreed to.

Q: Well, what do you mean by that? That's a little vague.

A: I mean that I made a lot of poor decisions because I was an emotional wreck and I'd like to revisit them at this point in time and its taken me an 11 year period of time—my baby is now 11 years old—to distance myself enough or perhaps to gain the emotional strength that I need to revisit this whole issue. I couldn't do it previously.

[T35–4 through 18]

The defendant has brought to the court's attention no reported decision, nor is it aware of any, that concludes that the desire or need to "revisit" an agreement in a matrimonial action, and in this case more than eight years since it was implemented, is, itself, a "change of circumstance."

Defendant, also, now argues the "mere passage of time" is a change of circumstances that warrants a modification in child support, citing, among other decisions, the holding in *Testut v. Testut*, 34 *N.J.Super.* 95, 101, 111 *A.*2d 513 (App.Div.1955).

This contention was not raised in the original motion, and its appropriateness in being presented at this time might be questioned on reconsideration pursuant to *R.*1:7–4. Nevertheless, the advancing age of the children and cost of living increasing as a result was certainly known to the parties at the time they entered into the post judgment agreement. They further acknowledged this by including Paragraph 5 in their agreement, providing for what was, in effect, a cost of living escrow account.

### III. THE BARGAINING AWAY OF CHILD SUPPORT.

██ The right to support belongs to the child and this right cannot be waived by a custodial parent. *Martinetti v. Hickman*, 261 *N.J.Super.* 508, 512, 619 *A.*2d 599 (App.Div.1993). Such decisions clearly state the obligations of both financially able parents. However, in the present matter, there has been no waiver of child support at this time.[2]

---

[2] Although the emancipation of either child is not in issue, Paragraph 7 of the post judgment agreement provides for "emancipation" upon "[t]he child reaching his eighteenth (18) birthday." Whether or not a parent has a continuing

The plaintiff has paid and continues to pay child support in accordance with the parties' post judgment agreement. In the final analysis, the issues come down to the enforcement of that agreement, and what relief may be provided from its terms when necessary to achieve a fair and just result.

## IV. CONSIDERATION FOR THE ANTI–LEPIS CLAUSE OF THE POST JUDGMENT AGREEMENT.

Defendant argues that the anti-*Lepis* provision contained in Paragraph 2 of the post judgment agreement is unenforceable since it is not supported by any consideration. Specifically, she contends that such consideration must be found in the paragraph, itself. To the contrary, plaintiff states that the anti-*Lepis* clause is enforceable, as part of the overall agreement reached by the parties.

The matter is in issue because what is argued was that the consideration, i.e. transfer of plaintiff's interest in the marital residence for the anti-*Lepis* clause, is found only in the paragraph providing for the waiver of alimony, and not the child support paragraph.

A written contract is to be construed so as to give affect to all of its parts, if possible, rendering no part meaningless or void. *New Wrinkle, Inc. v. John L. Armitage & Co.*, 238 *F.*2d 753 (3rd Cir.1956). Certainly, any agreement containing mutual promises and obligations must be supported by consideration. *Continental Bank of Pennsylvania v. Barclay Riding Academy, Inc.*, 93 *N.J.* 153, 459 *A.*2d 1163 (1983), *cert. denied, Barclay Equestrian Center, Inc. v. Continental Bank of Pennsylvania*, 464 *U.S.* 994, 104 *S.Ct.* 488, 78 *L.Ed.*2d 684.

---

obligation to support a child after age eighteen must be based upon an evaluation of the child's then needs and interests, including provision of a proper education. *Martinetti v. Hickman*, 261 *N.J.Super.* at 512, 619 *A.2d* 599.

■ Moreover, we must look to the entire agreement to determine what the parties intended. In other words, integration of an agreement is favored. *Borough of West Caldwell v. Borough of Caldwell,* 26 *N.J.* 9, 138 *A.*2d 402 (1958); *Wheatly v. Sook Suh,* 217 *N.J.Super.* 233, 525 *A.*2d 340 (App.Div.1987). Finally, the parties intent in entering into an agreement can be determined from their course of conduct in following its terms over an extended period. *Joseph Hilton & Associates, Inc. v. Evans,* 201 *N.J.Super.* 156, 492 *A.*2d 1062 (App.Div.1985), *certif. denied,* 101 *N.J.* 326, 501 *A.*2d 977; *Teamsters Indus. Employees Welfare Fund v. Rolls Royce Motor Cars, Inc.,* 989 *F.*2d 132 (3rd Cir.1993).

If the transfer of the plaintiff's interest in the marital residence is only the consideration for the waiver of alimony, then what is the consideration, for example, for the right of the defendant and children to relocate as they wish under Paragraph 4, and its obvious impact upon the specific visitation rights granted the plaintiff, particularly as to weekday and weekend visits, under Paragraph 3 of the original PSA?

Moreover, what consideration supports the elimination of the requirement for the plaintiff to provide life insurance under Paragraph 8 of the post judgment agreement? Finally, defendant in her own motion certification relates certain additional paragraphs of the agreement as further consideration for the transfer of plaintiff's property interest and/or the waiver of alimony under the earlier provision. This suggests an integrated agreement, where no provision is meaningless or unenforceable.

However, whether it was the intent of the parties to have an integrated agreement perhaps is best demonstrated by what they actually understood at the time and how they conducted themselves subsequently.

As earlier indicated, defendant in her deposition stated her understanding of the essence of the agreement as negotiations concluded in 1988, i.e., "he is offering me the house and at a much lower child support figure." T8–18 and 19.

Later in her deposition, she elaborated upon her understanding of the agreement:

Q: Now, in exchange for receiving the house, what rights, to the best of your recollection, were you giving up?

A: I believe he no longer had to pay an alimony figure and/or the mortgage figure that he was paying. And the child support was—I'm not sure what it was originally to be honest with you, but I believe then it was reduced to five hundred monthly.

[T16–1 through 7.]

A court normally will not make a better agreement than the parties made themselves, no matter how wise it believes it to be or how balanced it may or may not appear. *Karl's Sales and Service, Inc. v. Gimbel Brothers, Inc.*, 249 *N.J.Super.* 487, 592 *A.*2d 647 (App.Div.1991), *certif. denied,* 127 *N.J.* 548, 606 *A.*2d 362.

Moreover, the defendant drafted her own proposal in memorandum form in the course of negotiations that become the basis for the final post judgment agreement prepared by her real estate attorney. Finally, the parties have conducted themselves in the last eight years in accordance with the agreement they reached. A court should give affect to the parties' intentions as they indicated by their course of action. *Macfadden v. Macfadden,* 49 *N.J.Super.* 356, 139 *A.*2d 774 (App.Div.1958).

## V. THE HOLDING IN BENGIS V. BENGIS AND THE CASE FOR MODIFICATION.

Defendant argues that even if the anti-*Lepis* clause contained in the child support provision of the post judgment agreement is valid, nevertheless, under the holding in *Bengis v. Bengis, supra,* modification is warranted due to the "detrimental" impact the limitation is having on the support needs of the children.

In *Bengis,* plaintiff appealed the denial of an order to enforce an agreement whereby her most recent husband agreed to adopt plaintiff's daughters in return for her former husband being relieved of any further child support obligation, payment of certain delinquent taxes and agreeing to have no contact with the girls.[3]

---

[3] None of the parties produced any written agreement at trial. *Bengis,* 227 *N.J.Super.* at 356, 547 *A.*2d 701.

As a result, the former husband terminated support and his relationship with the children. Apparently, the plaintiff's recent husband treated the children as his own, expressed a desire to adopt them and continued to support them, until he filed for dissolution of his marriage with the plaintiff. *Id.* at 356, 547 *A.*2d 701.

In seeking to enforce the support agreement, the plaintiff had successfully argued to the trial court that the defendant should be equitably estopped to deny his support obligation, *pendente lite*. However, the court further concluded that the obligation did not continue after the divorce. *Id.* at 358, 547 *A.*2d 701. The court reasoned that while there was representation and reliance, the third element, i.e. "detriment"—"that the children would suffer future economic detriment," was not present, since the former husband was "amenable to the exercise of the court's jurisdiction" to re-establish his support obligation. *Id.* at 359, 547 *A.*2d 701.

In reversing the trial court's conclusion that "the contract between the parties was not [finally] binding because an agreement which would preclude children from seeking support from their natural father is against public policy," *Id.* at 358, 547 *A.*2d 701, the Appellate Division stated:

> [N]ot every agreement which makes provision for a child's future welfare will be held to violate public policy because one of the natural parents is relieved of that duty. Clearly, where the welfare of the children is concerned, the court has discretion, reasonably exercised, to reject such an agreement. . . . On this remand, the trial judge should determine the nature of the agreement; what consideration was agreed upon; whether it imposed a duty on [the most recent husband] which was intended to survive the dissolution of his marriage to plaintiff and articulate why it does not warrant judicial enforcement.
>
> [*Id.* at 362, 547 *A.*2d 701.]

Moreover, if a party voluntarily assumes another's support obligation and "is fully capable of discharging the duty," such an agreement is permissible. *Id.* at 361, 547 *A.*2d 701. Finally, in seeking to reimpose a support obligation, the determination of one's "ability to contribute to the legitimate future needs of the children" requires consideration of "the actual needs of the chil-

dren" and "the debts and liabilities of [plaintiff] and his responsibility for the support of others." *Id.* at 360–61, 547 *A.*2d 701.

The circumstances in *Bengis* are distinguishable from the present matter. In *Bengis,* the plaintiff sought enforcement of the agreement that relieved the natural father from his support obligation, and in the instant matter, the defendant seeks to avoid the limiting consequences of such an agreement.

In *Bengis,* it was argued the contractual obligation was ongoing with a continuation of necessary performance, while in the present matter it is argued the performance was complete with the transfer of plaintiff's interest in the marital residence. Moreover, in *Bengis* the natural father was relieved from any future support obligation, while the plaintiff in this matter continues to have such an obligation.

Finally, the court in *Bengis,* while finding that there must be a determination as to whether "the children will suffer future financial detriment" based upon the reliance and expectation of future support, made no qualitative analysis as to whether an agreement relieving one of support obligations would or would not be enforced, as required by the nature and degree of "detriment." As it stated, "[m]atrimonial cases are extremely fact sensitive.... The burden of establishing economic detriment depends on the facts of the particular case." *Id.* at 359, 547 *A.*2d 701. Moreover, the issue as to whether a lump sum payment or transfer of equity was sufficient consideration to relieve one of a further, ongoing support obligation was not even before the *Bengis* court.

Subsequent to *Bengis,* a number of courts have more directly considered the application of an anti-*Lepis* provision as to alimony and support obligations, which the *Bengis* court had concluded, as to a similar provision, is not necessarily violative of public policy "because one of the natural parents is relieved of that duty." *Id.* at 362, 547 *A.*2d 701. Initially, the decisions were mixed.

In *Smith v. Smith,* 261 *N.J.Super.* 198, 199–200, 618 *A.*2d 381 (Ch.Div.1992), the court concluded that an anti-*Lepis* clause as to

the modification of support obligations was not enforceable as being violative of public policy in precluding the exercise of the court's equitable jurisdiction. In *Finckin v. Finckin,* 240 *N.J.Super.* 204, 206, 572 *A.*2d 1199 (Ch.Div.1990), the court concluded that the use of an anti-*Lepis* clause did not violate public policy when the parties knowingly agreed to meet present and future reasonably foreseeable circumstances with a fixed payment and substituted this standard for the ability/needs economic tests of *Lepis.*

In reconciling these arguably conflicting decisions, the court in *Morris v. Morris,* 263 *N.J.Super.* 237, 622 *A.*2d 909 (App.Div. 1993), stated that "[t]o some extent we agree with both decisions." *Id.* at 241, 622 *A.*2d 909. The court went on to state that since it would be "equitable and fair" to grant modification for unforeseen or unplanned circumstances, it would, likewise, not be "equitable and fair" to permit such modification, either as to alimony or child support, when the parties have taken into account such future or increasing needs. *Id.* at 242, 622 *A.*2d 909.

■ Of course, in the interest of children particularly, a court is still free to require greater support when warranted by prevailing circumstances that may be characterized as "extreme" under the facts of the particular case. *Id.* at 245–46, 622 *A.*2d 909. This represents the appropriate balance between the court's *parens patriae* responsibility and the avoidance of any agreement, merely on a showing of even minor inconvenience when valuable consideration has previously been paid or granted.[4]

---

[4] The rule in *Morris,* however, involving economic issues, has not been extended to control social activities or conduct between the parties through modification of alimony or support obligations. *Melletz v. Melletz,* 271 *N.J.Super.* 359, 638 *A.*2d 898 (App.Div.1994).

In *Morris,* the parties specifically waived the right to seek alimony modification based upon changed circumstances, as set forth in *Lepis.* The "anti-*Lepis*" provision of Paragraph 2 of the instant post judgment agreement does not specifically refer to *Lepis.* To the degree it would bar under any circumstances further evaluation of the children's needs, it would be void even under *Morris.* Therefore, such "judicial surgery" as necessary by way of interpreta-

## VI. EVALUATION OF CHANGED CIRCUMSTANCES UNDER THE LEPIS AND MORRIS DECISIONS.

■ If the anti-*Lepis* provision of Paragraph 2 of the post judgment agreement is invalid for any reason, including its over-breadth, there would still have to be an evaluation of the respective needs and abilities to pay to determine whether modification was warranted. *Lepis, supra,* 83 *N.J.* at 152, 416 *A.*2d 45; *Innes v. Innes,* 117 *N.J.* 496, 504, 569 *A.*2d 770 (1990). If the anti-*Lepis* provision is valid, relief can still be granted when the circumstances approach the extreme under *Morris, supra,* even where there has been consideration paid and the parties planned for the eventuality, as argued in this case, the maturing of the children.

Either way, the answer requires the evaluation of all the factors of need and the ability between the parties, as earlier discussed, and as required even under *Bengis,* 227 *N.J.Super.* at 360–61, 547 *A.*2d 701.

It is undisputed that at the time plaintiff transferred his interest in the marital residence to the defendant, the total equity in the property amounted to $160,000, exclusive of a single mortgage in the principal amount of $60,000.[5]

The defendant had a number of options available to her at the time she acquired sole ownership of the marital residence, including its sale and relocation to less expensive housing or investment

---

tion will be undertaken to avoid such an inappropriate conclusion, neither rationale nor valid, while still given affect to the parties' reasonable intent. *Silverstein v. Keane,* 19 *N.J.* 1, 115 *A.*2d 1 (1955). Moreover, the provisions of Paragraph 5 of the agreement supports a finding that the parties did not intend no adjustment of child support, even if the use and the timing of the use of funds established under the provision requires judicial clarification, if not determination.

[5] Defendant argues that plaintiff's share of the equity, i.e. $80,000, equates only to the waiver of future alimony in a similar amount (Defendant's Motion Memorandum dated February 21, 1997). However, what is overlooked in this "quid pro quo" analysis is the fact that the defendant had the sole ownership of the marital residence and the complete use of its equity as a result of the transfer.

of the equity. She choose to use the equity by having the residence, as she states in her certification, "mortgaged to the hilt," i.e. $210,000, over the last eight years to allegedly meet living expenses. As a result, monthly mortgage payments must now be made in the amount of $2,496.48. (Defendant's certification dated February 11, 1997, paragraphs 7, 20, and 21.)

Defendant is salaried employed by the Internal Revenue Service. Based upon her Case Information Statement (CIS) dated October 2, 1996, her gross income was $52,023 for 1996, contrasted with $41,937 claimed as income for 1995. Defendant is married, her spouse is also employed, and it is appropriate to consider his income in determining whether modification of the plaintiff's level of child support is warranted. *Ribner v. Ribner,* 290 *N.J.Super.* 66, 75, 674 *A.*2d 1021 (App.Div.1996). Defendant's 1995 joint tax return attached to her CIS reflects her present husband's gross income in the amount of $52,923.70. No information was provided as to his 1996 income.

The two children of the parties' marriage reside with the defendant and her present husband. Based upon the information provided, total gross income of the defendant and her present husband is in the amount of approximately $104,946, for meeting theirs and the children's needs. The parties share the tax deductions for the two children. The gross income of the defendant and her present husband does not include, in terms of meeting familial needs, the $6,000 annually paid in child support by the plaintiff pursuant to Paragraph 2 of the post judgment agreement.

Defendant's CIS reflects monthly family expenses in the unadjusted amount of $6,161.03. Her monthly shelter expenses of $3,521.37, include a first mortgage payment for the marital residence, where she continues to reside with her present husband, in the amount of $1,603.74, inclusive of real estate taxes and homeowner's insurance. The principal amount of the mortgage has grown from $60,000 in 1988 to $145,000 in 1996. Two home equity loans, in the total face amount of $65,000 require additional monthly payments totaling $892.74. Total monthly mortgage pay-

ments, as stated, total $2,496.48, and constitute approximately twenty nine percent of their total gross income, without even factoring in the costs of utilities and routine maintenance.

Plaintiff's CIS dated December 20, 1996 reflects 1995 salary income of approximately $106,000, with incidental consultant income for him and his present wife, pension distribution, etc., making the total $121,508. His present wife is minimally employed, and he has two children by his present wife. His CIS also reflects gross 1996 income in the amount of at least $112,925. His monthly expenses, without adjustment, are $11,884, as to which, approximately $5,900 represents mortgage, real estate taxes and homeowner's insurance payments for two houses, one in New York and one in Florida, as well as a home improvement loan. Monthly credit card debts consume another $800 in income. Plaintiff is professionally employed in the medical field.

Even with the questionable liening of the marital residence in such an excessive fashion to meet claimed living expenses, and even without any reasonable adjustments to defendant's monthly expenses, the combined income of approximately $104,946, together with $6,000 of child support provided by the plaintiff measured against annual expenses of approximately $74,000, allowing even for appropriate deductions from gross income, cannot lead to the conclusion under *Lepis* that it would be "equitable and fair" to grant modification based upon need. Moreover, under *Morris,* there is no demonstration of "severe" economic detriment to the children. What has been demonstrated is a desire to shift excessive mortgage expenses to child support payments.

Defendant's most recent CIS, dated October 2, 1996, includes a pay stub which shows that she made gross income of $36,016 through September 14, 1996. Based on that figure the court projects annual gross income for defendant of $52,023, or approximately $1,000 per week. After taxes and deductions for medical insurance and union dues, the court determined her net weekly income as $660.63.

The defendant's current husband, according to his 1995 W–2 statement that is included in defendant's CIS, indicates that he had gross income of $56,869.60 for that year. However, after federal, social security, Medicare and state taxes are subtracted he is left with net annual income of $41,163.34, or $792 per week. Thus, the total available weekly income in defendant's household is approximately $1,453. In addition, household income is supplemented by the $500 per month that the plaintiff pays in child support. Therefore, total available monthly income is $6,747.90.[6]

An examination of the defendant's CIS reveals that even if the court were to take as true every monthly expense she lists, there is still approximately $600 in disposable income remaining at the end of each month. Her Schedule A, B and C monthly expenses total $6,161 .03 while as mentioned above, the total available monthly household income is $6,747.90.[7]

Any way in which the court examines the financial picture in the defendant's current household, the children are neither suffering nor do they appear to be in need of anything. Moreover, the court is being extremely generous in its analysis of defendant's CIS in that it has accepted as accurate all the expenditures included in it. Normally, the court would reduce or eliminate expenses it felt was either inappropriate or inflated. In this case the court did neither, although there are items on her CIS which would have been adjusted. In addition, the court notes that

---

[6] The court determined monthly income by multiplying $1,453 times 4.3 weeks to get the sum of $6,247.90, and then added the $500 the plaintiff pays in child support.

[7] Defendant may argue that the court did not consider that part of what it considered "available income" in reality was placed in hers and her current husband's 401k plans, and thus, was not available for their use. However, even deducting the amounts defendant and her spouse contributed to their respective plans in 1995, $3,945.90 for him and $3,100.12 for her, monthly available income is reduced to only $6,165.25, an amount still higher than defendant's monthly expenses. Moreover, the court considers contributions to such retirement plans as voluntary deductions and has performed these calculations only to further demonstrate the flaws in defendant's argument.

defendant's current spouse's income figure is from 1995 and, therefore, it is not unreasonable to assume since he and defendant both work at the Internal Revenue Service and her income has steadily risen, that his has likewise increased.

In summary, comparing the parties' economic status under even the ability/needs standards of *Lepis*, without even considering the *Morris* standard for modification of child support, requires the court to conclude that it would not be "equitable and fair" to revise plaintiff's child support obligation. Defendant has not even, initially, demonstrated the overriding need based upon her and her present spouse's joint income and needs. Their present joint income and expenses do not demonstrate "that the children would suffer future economic detriment" at this time, even under *Bengis, supra.*

An application to modify a support obligation is neither a mechanism to transfer wealth nor merely a device to shift one's expenses, without a showing of actual need. Therefore, defendant's motion for reconsideration is denied.