704 A.2d 591

KATHLEEN KONZELMAN, PLAINTIFF–RESPONDENT, CROSS–APPELLANT, v. LAWRENCE KONZELMAN, DEFENDANT–APPELLANT, CROSS–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued October 29, 1997—Decided January 16, 1998.

---

[4] Norman J. Chidiac, defendant's counsel.

Before Judges BAIME, BROCHIN and WEFING.

*Edward S. Snyder,* argued the cause for appellant-cross-respondent (*Wolff & Samson,* attorneys; *Mr. Snyder, Cynthia Borsella Lindemann,* and *Vanessa H. Silverstein,* on the brief).

*G. Dolph Corradino,* argued the cause for respondent-cross-appellant (*Mr. Corradino,* attorney; *Patrick W. Harrington,* on the brief).

The opinion of the court was delivered by

BROCHIN, J.A.D.

Plaintiff Kathleen Konzelman and defendant Lawrence Konzelman were married July 18, 1964 and divorced October 28, 1991. Their property settlement agreement, incorporated into their divorce judgment, required Mr. Konzelman to pay permanent alimony of $700 a week until his or his former wife's death, his wife's remarriage, or his wife's "[c]ohabitation ... with an unrelated adult male for a period of four continuous months." Contending that the latter contingency had occurred, Mr. Konzelman stopped making alimony payments. Ms. Konzelman denied cohabitation and moved for the resumption of alimony. Because their children are emancipated adults, there is no issue of child support.

After extensive discovery and a bench trial that was conducted on thirteen separate dates between April 11 and July 13, 1994, the judge found that Ms. Konzelman and an "unrelated adult male,"

Mr. Robert Liput, were continuously cohabiting within the meaning of the Konzelmans' property settlement agreement. The court ruled, however, that the provision of the Konzelmans' agreement which provided for termination of alimony in the event of cohabitation violated public policy and was therefore unenforceable under *Melletz v. Melletz,* 271 *N.J.Super.* 359, 638 *A.*2d 898 (App.Div.), *certif. denied,* 137 *N.J.* 307, 645 *A.*2d 136 (1994). After further discovery and another three-day bench trial in September 1995, the court found that Mr. Liput was contributing at least $170 a week to Ms. Konzelman's financial support and, pursuant to *Gayet v. Gayet,* 92 *N.J.* 149, 456 *A.*2d 102 (1983), the court reduced Mr. Konzelman's alimony obligation by that amount. The trial judge denied the award of an attorney's fee to either party.

Mr. Konzelman has appealed and Ms. Konzelman has cross-appealed. He argues that the anti-cohabitation clause of their agreement is valid and should have been enforced as written. Alternatively, he contends that all alimony should have been discontinued because Ms. Konzelman failed to prove that neither she nor Mr. Liput contributed to the other's financial support. Ms. Konzelman argues that the court erred in finding that she and Mr. Liput were cohabiting and therefore her alimony should not have been reduced. Each of the parties complains about the court's denial of his or her application for an attorney's fee, and each asks this court to enter a favorable judgment without remanding the case to the trial court.

At the initial trial, Mr. Konzelman presented a private investigator who testified that he had conducted a surveillance of Ms. Konzelman's residence seven days a week for 127 continuous days. According to the investigator, on weekdays Mr. Liput would usually pick up the newspaper from the end of Ms. Konzelman's driveway at 7 a.m., get into his car, drive to work, return to the house in the late afternoon or evening, and remain in the house overnight. There were, however, obvious errors in the investigator's testimony and discrepancies between his field notes and his final report.

Nonetheless, Mr. Liput and Ms. Konzelman conceded that they had a close, exclusive, "romantic relationship," at least since approximately April or May 1990. Ms. Konzelman testified that during 1991, 1992, and 1993, she and Mr. Liput spent at least 30 weekends a year and some weekday nights together, either at her three-bedroom, ranch-style home in Wayne, New Jersey, or on vacation trips elsewhere. In 1993, they went on an eight-day ski vacation to Switzerland in February; from March 26 to the end of April, they skied together in Vail, Colorado; from May 25 to June 1, they traveled together in Germany; and they rented a condominium together at the Jersey shore from July 17 to July 24. In February 1994, they went skiing together in Italy. Ms. Konzelman testified she won the 1993 trip to Germany as a cash register prize at a supermarket; Mr. Liput paid for all of the expenses of their other vacations except some unidentified airplane tickets which were purchased with frequent flyer miles.

Mr. Liput and Ms. Konzelman customarily spent holidays and other occasions in each other's company, together with other members of their families. In 1993, Mr. Liput and Ms. Konzelman had Easter dinner at Mr. Liput's cousin's house. They celebrated July 4th at a barbecue for twenty guests at Ms. Konzelman's home; Ms. Konzelman's mother, Mr. Liput's sister, and his sister's boyfriend were among the guests. They spent Christmas Eve at Mr. Liput's sister's house with other members of his family; they had Christmas dinner at Ms. Konzelman's home with her brother and his family, Ms. Konzelman's mother, and a few friends. They spent New Year's Eve and New Year's Day together. During 1993, there were a dozen visits of one or more of Mr. Liput's children to Ms. Konzelman's home. Mr. Liput's 19–year old son went skiing with them in Okemo, Vermont in January 1994. On Mother's Day 1994, Mr. Liput's mother was at Ms. Konzelman's house, and then she, Mr. Liput, and Ms. Konzelman went somewhere else for dinner. Ms. Konzelman accompanied Mr. Liput when he went to visit his son at a drug rehabilitation center in Pennsylvania, and she has been a spectator

at some of the softball games in which Mr. Liput's team, the Ageless Wonders, was playing.

Ms. Konzelman's garage door can be opened by a remote door-opener. Mr. Liput keeps a door-opener for her garage in his car. Her home is protected by an alarm system which is armed or disarmed by entering codes from keypads in the house. He has the code for disarming the system. He keeps tools, his bicycle, and, some of the time, his skis in her garage, and some clothes and toilet articles in her house. Mr. Liput cuts the lawn at Ms. Konzelman's residence and does other gardening there. He also cleans the gutters and the above-ground swimming pool. He bought and paid for the pool. In the records of Mr. Liput's softball team, the telephone number for contacting him is Ms. Konzelman's number.

Throughout the trial on "cohabitation," Ms. Konzelman denied that she had a joint bank account with Mr. Liput. During the subsequent trial on their financial interdependence, they were shown to have a joint savings account. Ms. Konzelman claimed that the account was solely for the benefit of her mother, and that she and her brother, who lives in California, deposited money into the account for her mother's use. There was no evidence, however, that Ms. Konzelman's brother had ever deposited money into the account. The proofs showed that no money from the account had ever been used for the benefit of Ms. Konzelman's mother. But funds had been deposited and withdrawn by both Ms. Konzelman and Mr. Liput. One deposit slip written by Ms. Konzelman listed the depositor's address as her own and showed Mr. Liput as the depositor.

There was substantial evidence in the record to support the court's finding that Mr. Liput was contributing at least $170 a week toward Ms. Konzelman's financial support. Mr. Konzelman introduced evidence of the rental value of Ms. Konzelman's home, arguing that, because Mr. Liput paid no rent, she was supporting him to the extent of his share of its rental value, but the court found that the evidence of rental value was inadequate.

Mr. Liput denied that he was residing with Ms. Konzelman. He testified that his residence was a one-bedroom condominium in Kearny which he shared with his ill, elderly mother. He claimed that he slept in a pull-out sofa-bed in the living room of the apartment where, according to his testimony, he kept his clothing in two armoires and a bureau. His mother uses the living room closet to store her clothing.

The evidence shows that Mr. Liput did not contribute to the purchase of the condominium and that he was not contributing significantly to the expense of maintaining it. He knew only two of the residents of neighboring apartments and, when his pretrial deposition was taken, he did not know the number of his parking space. Ms. Konzelman testified that during the course of four years she had visited the Kearny apartment no more than four or five times. She did not know the number of the telephone in the apartment.

Mr. Liput's testimony that his real place of abode was his sick, elderly mother's one-bedroom condominium in Kearny tended to confirm rather than to refute the evidence that he was living with Ms. Konzelman in her home in Wayne. The trial court disbelieved his testimony. After acknowledging the flaws in the testimony of Mr. Konzelman's investigator and summarizing the other evidence, the court declared:

> [T]he other evidence which was adduced ... indicates to me that the true nature of the relationship was one in which Lipit [sic] was at the Konzelman residence on a regular basis, that he resided there, that he left for work at that residence, that he engaged in extensive familial contact with Mrs. Konzelman involving her family and his family, that he had undertaken the assumption of duties and obligations usually manifested by married people, although there was no direct testimony that they had ever held themselves out to be man and wife.
>
> .... Clearly, the parties understood that were they to openly engage in a relationship in which Mr. Lipit [sic], without hesitation, acknowledged his residence at the Konzelman residence, that ... Mr. Konzelman would invoke the provisions of the clause and attempt to terminate alimony....
>
> .... I find that [Mr. Konzelman] has established that ... Mrs. Konzelman and Mr. Liput were residing together and as I said, were cohabiting....

The evidence is more than sufficient to justify these findings. There is also adequate evidence to sustain the court's

finding that Mr. Liput contributed to Ms. Konzelman's financial support at least to the extent of approximately $170 a week. We therefore reject Ms. Konzelman's challenges to the trial court's factual determinations. *Cf. Rova Farms Resort v. Investors Ins. Co.,* 65 *N.J.* 474, 484, 323 *A.*2d 495 (1974).

The Konzelmans' property settlement agreement does not define "cohabitation." The term, however, has a recognized meaning in the context in which it was used. As Ms. Konzelman's attorney told the trial judge during the argument of a motion, "what that means to me legally is that two people resided together—for an old fashioned expression, as man and wife, and shared those type[s] of obligations.... physical, non-physical, economic and non-economic." The first definition of "cohabit" in the *American Heritage Dictionary* 369 (1992 ed.) is "To live together as spouses." *Webster's Third New International Dictionary of the English Language Unabridged* 440 (1986) defines "cohabit" as "to live together as or as if husband and wife us[ually] without a legal marriage having been performed"; it defines "cohabitation" as "the act or state of cohabiting esp[ecially] as or as if husband and wife." A legal dictionary defines cohabitation as:

> To live together as husband and wife. The mutual assumption of those marital rights, duties and obligations which are usually manifested by married people, including but not necessarily dependent on sexual relations.
>
> [*Black's Law Dictionary* 236 (5th ed.1979).]

This court quoted the latter definition of "cohabitation" with approval in *Crowe v. De Gioia,* 203 *N.J.Super.* 22, 33, 495 *A.*2d 889 (App.Div.1985), *aff'd o.b.,* 102 *N.J.* 50, 505 *A.*2d 591 (1986). Reported cases from other jurisdictions have defined "cohabitation" in a similar fashion:

> "[C]ohabitation" ... refers to a domestic arrangement between a man and woman who are not married to each other, but who live as husband and wife, in that, for more than a brief period of time, they share a common domicile and living expenses and are sexually intimate.
>
> [*Edwards v. Edwards,* 73 *Or.App.* 272, 698 *P.*2d 542, 547 (1985).]
>
> [T]he term "cohabitation" implies more than merely a common residence or a sexual relationship. We believe the ordinary definition of "cohabitation," describing a relationship of living together "as man and wife," connotes mutual assumption

of the duties and obligations associated with marriage.... In interpreting "cohabitation," courts may consider indicia such as:

1. establishment of a common residence;

2. long-term intimate or romantic involvement;

3. shared assets or common bank accounts;

4. joint contribution to household expenses; and

5. recognition of the relationship by the community.

[*Gordon v. Gordon*, 342 *Md.* 294, 675 *A.*2d 540, 547–48 (1996) (footnotes omitted).]

As the trial court implicitly ruled in the present case, there is no reason to doubt that the Konzelmans' agreement uses "cohabitation" in the sense ascribed to it by these authorities. Thus defined, the term accurately describes the relationship between Mr. Liput and Ms. Konzelman. Consequently, as the trial court also implicitly recognized, Mr. Konzelman proved the condition which the parties' agreement establishes as the predicate for terminating his obligation to pay alimony. The court refused to order termination of alimony, however, only because it concluded that that result was foreclosed by New Jersey public policy as defined in *Gayet, supra*, and *Melletz, supra*. For the following reasons, we disagree with that conclusion.

In *Gayet*, our Supreme Court held that a dependent former spouse's cohabitation with a person of the opposite sex would not necessarily terminate the supporting spouse's obligation to pay alimony. The Court described as follows two conflicting policies which affected its decision:

Two policies of the law intersect in the resolution of this issue. First, the Legislature has directed that alimony shall terminate upon remarriage. *N.J.S.A.* 2A:34-25; *see Sharpe v. Sharpe*, 109 *N.J.Super.* 410 [263 *A.*2d 490] (Ch.Div.1970), *mod.*, 57 *N.J.* 468 [273 *A.*2d 572] (1971). This signals a policy to end alimony when the supported spouse forms a new bond that eliminates the prior dependency as a matter of law. That policy, however, can conflict with another state policy that guarantees individual privacy, autonomy, and the right to develop personal relationships free from governmental sanctions.

[*Gayet, supra*, 92 *N.J.* at 151, 456 *A.*2d 102.]

The *Gayet* Court recognized "the sense of injustice that will be engendered in the supporting spouse," but it concluded that to accommodate these conflicting policies, "[t]he extent of actual

economic dependency, not one's conduct as a cohabitant, must determine the duration of support as well as its amount." *Id.* at 154, 456 *A*.2d 102.

Significantly, however, in *Gayet, supra,* the divorcing spouses had not agreed that cohabitation would be a ground for terminating alimony. Judicial modification of the alimony provision of the judgment of divorce would have been necessary to authorize the termination. In the present case, the parties agreed that "cohabitation ... with an unrelated adult male for a period of four continuous months" would be a reason to terminate alimony. Ms. Konzelman testified that she intended to abide by that agreement and she has not contended that her consent to it was coerced.

Consequently, in the present case, when we decide how to balance the "policy to end alimony when the supported spouse forms a new bond" against the competing claims of the "state policy that guarantees individual privacy, autonomy, and the right to develop personal relationships free from governmental sanctions," the balance is significantly affected by the divorcing spouses' voluntary agreement that alimony would terminate upon cohabitation. As our Supreme Court wrote,

> We have recognized and emphasized repeatedly that matrimonial agreements between spouses relating to alimony and support, which are fair and just, fall within the category of contracts enforceable in equity. Such agreements are essentially consensual and voluntary in character and therefore entitled to considerable weight with respect to their validity and enforceability notwithstanding the fact that such an agreement has been incorporated in a judgment of divorce.
>
> [*Petersen v. Petersen,* 85 *N.J.* 638, 642, 428 *A.*2d 1301 (1981) (citations omitted).]

The Court went on to emphasize, however, that such agreements relating to alimony and support are enforceable only when they are equitable and just, but that "it should be the burden of the party challenging the validity and enforceability of such an agreement to show that its terms, in light of changed circumstances, are unfair and unjust." *Petersen, supra,* 85 *N.J.* at 644, 428 *A.*2d 1301; *cf. Massar v. Massar,* 279 *N.J.Super.* 89, 93, 652 *A.*2d 219 (App.Div.1995) ("Marital agreements.... are approached with a predisposition in favor of their validity and enforceability.")

In *Melletz, supra,* we held that the clause of a property settlement agreement which suspended alimony during the wife's cohabitation with an unrelated male was unenforceable because, as interpreted by the trial court and as applied to the facts of the case, the clause was clearly unfair and unjust. According to the trial judge, from August 30, 1991 through November 1991,

> the defendant-wife maintained a social or dating relationship with an individual identified as [Mr. C.]. At all times material, the defendant-wife and [the friend] maintained separate residences but socialized and dated by engaging in such activities as shopping, going out to restaurants, eating meals at the residence of the other and remaining over night with each other. The defendant-wife, during her testimony recalled at least ten overnight stays by [the friend] at the [defendant's] new condominium in Mount Laurel, New Jersey. Both the defendant-wife and [the friend], during their testimony, described their relationship as "just dating" and as "a warm friendship."
>
> [*Melletz, supra,* 271 *N.J.Super.* at 363, 638 *A.*2d 898.]

If the provision of the Melletzs' agreement for the suspension of alimony during cohabitation was applicable to those facts, it was clearly arbitrary, unreasonable, unjust and therefore unenforceable.

Numerous cases throughout the country have enforced voluntary agreements for the suspension or termination of alimony in the event of the dependent former spouse's "cohabitation" with a person of the opposite sex in a relationship tantamount to marriage. *See, e.g., D'Ascanio v. D'Ascanio,* 237 *Conn.* 481, 678 *A.*2d 469, 471–73 (1996); *Quisenberry v. Quisenberry,* 449 *A.*2d 274, 276–77 (Del.Fam.Ct.1982); *Quillen v. Quillen,* 265 *Ga.* 779, 462 *S.E.*2d 750, 750–51 (1995); *Herrin v. Herrin,* 262 *Ill.App.*3d 573, 199 *Ill.Dec.* 814, 817–18, 634 *N.E.*2d 1168, 1171–72, *appeal denied,* 157 *Ill.*2d 501, 205 *Ill.Dec.* 162, 642 *N.E.*2d 1279 (1994); *Bell v. Bell,* 393 *Mass.* 20, 468 *N.E.*2d 859, 860–61 (1984), *cert. denied,* 470 *U.S.* 1027, 105 *S.Ct.* 1392, 84 *L.Ed.*2d 782 (1985); *Barr v. Barr,* 922 *S.W.*2d 419, 421 (Mo.Ct.App.1996); *Spector v. Spector,* 112 *Nev.* 1395, 929 *P.*2d 964, 965 (1996); *Zipparo v. Zipparo,* 70 *A.D.*2d 616, 416 *N.Y.S.*2d 321, 322 (1979); *Rehm v. Rehm,* 104 *N.C.App.* 490, 409 *S.E.*2d 723, 724–25 (1991); *Taylor v. Taylor,* 11 *Ohio App.*3d 279, 465 *N.E.*2d 476, 477–78 (1983); *Edwards, supra,* 698 *P.*2d at 547; *Frey v. Frey,* 14 *Va.App.* 270, 416 *S.E.*2d 40, 42–43 (1992);

see also *Diane M. Allen, Annotation,* Divorced or Separated Spouse's Living With Member of Opposite Sex as Affecting Other Spouse's Obligation of Alimony or Support Under Separation Agreement, *47* A.L.R.4th *38 (1986 & Supp.1997). When the issue of public policy has been raised, courts have expressly held that there is no public policy against the enforcement of such an agreement.* See, e.g., Alford v. Alford, *594* So.2d *843, 844 (Fla. Dist.Ct.App.1992);* Weathersby v. Weathersby, *693* So.2d *1348, 1352 (Miss.1997);* Spector, supra, *929* P.2d *at 965;* see also Desler v. Desler, *56* Or.App. *812, 643* P.2d *655, 658 n. 3 (1982). To the extent that language in the* Melletz *opinion can be read as declaring that it would never be just and equitable to enforce the terms of a voluntary property settlement agreement which provide for the suspension or termination of alimony when the dependent spouse has formed a new, apparently permanent, marriage-like relationship with another person of the opposite sex, we respectfully disagree.*

▆▆▆ Remarriage of a dependent spouse terminates the obligation of the supporting spouse to pay permanent alimony. *N.J.S.A.* 2A:34–25; *Lepis v. Lepis,* 83 *N.J.* 139, 151 n. 4, 416 *A.*2d 45 (1980); *Flaxman v. Flaxman,* 57 *N.J.* 458, 462, 273 *A.*2d 567 (1971). After a divorce, one divorced spouse has no right to attempt to control the other's personal behavior. *See Gayet, supra,* 92 *N.J.* at 151, 456 *A.*2d 102. But there are no considerations of public policy which should prevent competent parties to a divorce from freely agreeing that if the dependent spouse enters into a new relationship which, but for the license, is tantamount to a marriage, the economic consequences of the new relationship will be the same as those of a remarriage. We therefore hold that a provision of a property settlement agreement, freely entered into, which causes permanent alimony to terminate if the dependent spouse enters into a new relationship which has all the indicia of marriage except a license is enforceable.

Ms. Konzelman's cohabitation with Mr. Liput has been of long duration and was still continuing at the time of trial. Consequently, the facts of this case do not require us to decide whether the contractual provision for termination of Ms. Konzelman's alimony

would have been enforceable if her cohabitation with Mr. Liput had lasted only for four months or for some other brief period. We are also not required to decide whether Mr. Konzelman's obligation to pay alimony will be revived if Ms. Konzelman's cohabitation terminates. We have therefore refrained from attempting to determine either of these issues.

Mr. Konzelman's obligation to support his former wife terminated as of the date of his filing his cross-motion to be relieved of his permanent alimony obligation. Except for the issue of attorneys' fees, this conclusion moots any of the other issues not discussed in our opinion which either of the parties has raised on appeal. Our disagreement with the trial court about Mr. Konzelman's obligation to continue to pay alimony does not necessarily imply that the court's determination on the issue of attorneys' fees should have been different. Nonetheless, the trial court should have the opportunity to reconsider the issue of attorneys' fees in the light of our holding on the merits.

The judgment appealed from is therefore reversed and the case is remanded for further proceedings not inconsistent with this opinion.