799 A.2d 742

**No. FM–13–080–02C.**

RICHARD S. LAROCCO, PLAINTIFF, v. KIM
GABRIEL GARDELLA, DEFENDANT.

Superior Court of New Jersey
Chancery Division Family Part
Monmouth County

January 31, 2002.

*Brian P. Latimer, (Jacobowitz, Grabelle, Defino & Latimer)*, Attorneys for Plaintiff.

*Robin Jill Schneider*, for Defendant.

CAVANAGH, J.S.C.

The issue presented in this matter is whether the threshold venue requirement for the Chancery Division—Family Part is satisfied by a short term dating relationship.

The Plaintiff brings this action in the Family Part of the Chancery Division, asserting that he formerly dated and later "resided" with the Defendant. He seeks title to personal property and reimbursement of funds which he asserts were provided to the Defendant during their relationship in contemplation of marriage. The verified complaint identifies several legal theories for his claims which include: breach of promise, unjust enrichment, breach of *quasi* contract, legal and equitable estoppel and specific performance.[1] The Defendant repudiates the allegations and characterizes the personal property and money as inter vivos gifts, which the Plaintiff bestowed upon her as part of his profuse courtship, during their dating period.

The Plaintiff's principal claim for personalty involves a diamond ring, which he identifies as an engagement ring. Therefore, under New Jersey law, he contends it should be returned to him as a conditional gift. *Winer v. Winer,* 241 *N.J.Super.* 510, 575 *A.*2d 518 (App.Div.1990) and *Aronow v. Silver,* 223 *N.J.Super.* 344, 538 *A.*2d 851 (Ch.Div.1987). The Defendant challenges the classification of the item as an engagement ring, and further contends it was purchased through her personal charge account, and she subsequently made payments on the balance of the purchase price. Although the Defendant concedes that the parties discussed a possible marriage after the Plaintiff obtained a divorce, she asserts that he gave her the items as *inter vivos* gifts, not contingent upon the event of marriage. *Canova v. Canova,* 146 *N.J.Super.* 58, 368 *A.*2d 971 (Ch.Div.1976) and *Gerard v. Distefano,* 84 *N.J.Super.* 396, 202 *A.*2d 220 (Ch.Div.1964).

Predicated upon the potential for irreparable harm due to the mobility of the personal property, the Plaintiff obtained an *ex*

---

[1] Since a claim for damages predicated upon breach of contract to marry has been barred since 1935 by the Heart Balm Act, *N.J.S.A.* 2A:23-1 et seq., the portions of the Plaintiff's complaint seeking compensatory and punitive damages are of questionable validity. However, since the issue before the Court is the proper venue for the action, that determination will be deferred until the matter is considered on the merits.

*parte* Order to Show Cause with temporary restraints. The Defendant moved for dissolution of those restraints and other relief subsequent to service of the Order to Show Cause. After oral argument on the return date, the Court requested additional submissions from both attorneys, principally addressing the venue requirement which was raised by the Court. A second oral argument was conducted during which time the parties testified regarding the threshold issue.

Venue in the various divisions of Superior Court is established in *R.* 4:3–1 of the rules governing the Courts of the State of New Jersey.

*R.* 4:3–1(a)(3) provides as follows:

Chancery Division—Family Part. All civil actions in which the **principal** claim is **unique to** and **arises out of** a family or **family-type** relationship shall be brought in the Chancery Division, Family Part. Civil family actions cognizable in the Family Part shall include all actions and proceedings provided for in Part V of these rules; all civil actions and proceedings formerly cognizable in the juvenile and domestic relations court; and all other actions and proceedings **unique to** and **arising out of** a family or **family-type** relationship. (Emphasis added)

*See also, R.* 5:1–2.

Since the parties in this matter clearly never became a family, the fundamental question presented herein is whether their ephemeral dating relationship fulfills the above criteria by constituting a "family-type" situation. To that end, the Court must consider the issue in light of the 1983 amendment to the Constitution of the State of New Jersey creating a Family Court (N.J. Const. art. VI, § 3, ¶ 3.), while remaining cognizant of the overriding notion that the Family Court should specialize in and be uniquely suited to address the problems of families in all related matters. *Brennan v. Orban,* 145 *N.J.* 282, 678 *A.*2d 667 (1996).

As support for his position on the venue issue, the Plaintiff relies primarily upon the recent and well reasoned decision of Judge Fisher in *Dey v. Varone,* 333 *N.J.Super.* 616, 756 *A.*2d 652 (Ch.Div.2000), which interpreted the salient language regarding venue in *R.* 4:3–1. Although that case presented a comprehensive

fact pattern that justified transfer of a pending property dispute to the Family Part, the instant matter contains a number of compelling factual and legal distinctions, which result in the Plaintiff's reliance on that decision to be infelicitous.

Clearly, the *Dey* Court was not presented with the traditional components of a "family" relationship, since the factual background therein did not contain a principal claim which arose from dissolution, annulment, or a child related issue. Nevertheless, the conclusion therein, which established venue in the Family Part, was the result of the underlying domestic arrangement of the parties, which clearly comported with the requirements necessary to establish cohabitation. *See, Crowe v. DeGioia,* 102 *N.J.* 50, 505 *A.*2d 591. (1986); *Kozlowski v. Kozlowski,* 80 *N.J.* 378, 403 *A.*2d 902 (1979) (Pashman, J., concurring). The parties in *Dey* cohabited together on a full-time basis for approximately twelve years. Both conceded they had agreed to marry approximately nine years earlier at the time of their engagement. The couple, neither of whom was married to anyone else, lived together for over a decade in a family-type environment, which included a systematic division of living expenses and the joint purchase and usage of various items of personal property.

The judicial matrix from which the Chancellor drew his conclusion was equally as compelling as the factual background. Initially, he relied upon a recent Supreme Court case which considered the claim of a third party for joint custody and visitation with her former domestic partner's biological children. *V.C. v. M.J.B.,* 163 *N.J.* 200, 748 *A.*2d 539 (2000), (O'Hern, J., and Long, J. J., concurring). The Plaintiff therein previously cohabited in a "family-type" setting with the Defendant and functioned as a psychological parent to her former partner's children for approximately three years. The parties purchased a home together, participated in a commitment ceremony where they were "married," and together with the children, were blessed as a family.

Justice Long, in her concurring opinion, provided a series of considerations for utilization in determining "family-type" characteristics, which are cogent when considering the current issue.

[W]e should not be mislead into thinking any particular model of family life is the only one that embodies 'family values.' Those qualities of family life on which society places a premium—its stability, the love and affection shared by its members, their focus on each other, the emotional and physical care and nurturence that parents provide their offspring, the creation of a safe harbor for all involved, the wellspring of support family life provides its members, the ideal of absolute fealty in good and bad times that infuses the familial relationship (all of which justify isolation from outside intrusion)—are merely characteristics of family life that, except for its communal aspect, are unrelated to the particular form a family takes...

What is required is the creation of 'an intimate familial relationship that is stable, enduring, substantial and mutually supportive, ... one that is cemented by strong emotional bonds and provides deep and pervasive emotional security.' *V.C.*, at 232, 748 *A.2d* at 556, quoting *Dunphy v. Gregor*, 136 *N.J.* 99, 115, 642 *A.2d* 372 (1994).

An additional persuasive juridical reference in *Dey* was *Olson v. Stevens*, 322 *N.J.Super.* 119, 730 *A.*2d 432 (App.Div.1999), wherein the Appellate Division transferred a partition action involving real estate held jointly by unmarried cohabitants whose union had lasted for 16 years and produced a child. The petition was transferred to the Family Division, where a palimony action and a request for child support had been previously filed. In addition to the presence of several traditional domestic issues which were historically handled in the Family Part, the Court also relied upon the principal of judicial economy as a basis for the transfer.

While this Court concurs with Judge Fisher's observation that our Courts do not require evidence of a marriage license for a matter to be properly venued in the Family Part, it can not accept the Plaintiff's position that the instant property dispute is appropriately venued herein. Each of the cases relied upon by the Plaintiff contains a common theme, a cohabitative domestic arrangement which comports with the Family Part criteria for venue as defined in our court rules. The Plaintiff would have this Court expand the scope of that venue well beyond the reasoning in *Dey*, despite the absence herein of the lynchpin relied upon in that decision to determine venue. Unless the Plaintiff can establish cohabitation with the Defendant, he does not present a principal claim which qualifies as a "family-type" relationship. This Court will not augment the venue concept to include his cause of action.

The foremost legal dictionary defines cohabitation as: "To live together as husband and wife. The mutual assumption of those marital rights, duties and obligations which are usually manifested by married people, including but not necessarily dependent upon sexual relations", *Black's Law Dictionary* at 236 (5th ed.1979).

'[C]ohabitation'. . . refers to a domestic arrangement between a man and woman who are not married to each other, but who live as husband and wife, in that, for **more than a brief period of time,** they **share** a **common domicile** and **living expenses** and are sexually intimate. *Edwards v. Edwards,* 73 *Or.App.* 272, 698 *P.2d* 542, 547 (1985) (Emphasis added).

■ "[T]he term 'cohabitation' implies more than merely a common residence or a sexual relationship. We believe the ordinary definition of 'cohabitation', describing a relationship of living together as 'man and wife', connotes mutual assumption of the duties and obligations associated with marriage. . . . In interpreting 'cohabitation' courts may consider indicia such as:

1. establishment of a common residence;
2. long-term intimate or romantic involvement;
3. shared assets or common bank accounts;
4. joint contribution to household expenses; and
5. recognition of the relationship by the community."

*Gordon v. Gordon,* 342 *Md.* 294, 675 *A.2d* 540, 547–48 (1996)(footnotes omitted) [2].

Our Supreme Court in the majority opinion in *Konzelman v. Konzelman,* 158 *N.J.* 185, 729 *A.2d* 7 (1999) (O'Hern, J., and Stein, J., dissenting) recently underscored the distillable principal upon which a finding of cohabitation is predicated. "We stress that to constitute cohabitation the relationship must be shown to be **serious** and **lasting**." *Id* at 203, 729 *A.2d* 7. (Emphasis added).

■ The parties in this case began to date casually in the fall of 2000, and eventually graduated to an intimate relationship within a few months. As a result, the Plaintiff spent a series of weekends at the Defendant's condominium in Freehold over a period of

---

[2] Both cases were cited with approval and relied upon by the Appellate Division decision in *Konzelman v. Konzelman,* 307 *N.J.Super.* 150, 158, 704 *A.2d* 591 (App.Div.,1998), aff'd. 158 *N.J.* 185, 729 *A.2d* 7 (1999)( O'Hern, J., and Stein, J., dissenting).

several months. While the testimony differed substantially on the cumulative number of nights spent together, the Plaintiff conceded that during their temporary relationship, he never spent a single weeknight in Freehold. Throughout the duration of the parties' romantic liaison, Plaintiff returned from his employment in New York City each weekday to his home on Staten Island, where his wife and children lived and continue to reside. Furthermore, no formal announcement of an engagement was ever published or circulated, nor were any efforts made to arrange a marriage ceremony or reception. The affair ruptured during April of 2001. By the first week in May, the Defendant memorialized her decision to terminate the relationship.

Plaintiff, remains married at present, although a divorce action is apparently pending in New York. He also concedes that at no time during the relevant period did the parties ever initiate a joint account, comingle funds, jointly purchase real property, transfer title to the Freehold condominium into joint names, or share specific expenses in the Freehold residence, although Plaintiff gave monies to the Defendant each month to defray some of the expenses. Consistent with the foregoing, Plaintiff never obtained a New Jersey driver's license, changed his voter registration to New Jersey, nor had any personal mail directed to the Freehold address, with the exception of his American Express bill, which included the recorded charges relating to the affair. During the five months in question, the Plaintiff never personally introduced the Defendant to members of his family, including his teenage daughter, although his son visited the Freehold condominium on several occasions without spending the night.

The Plaintiff's sporadic presence at the Defendant's condominium on a part time basis over a period of several months falls woefully short of the substance of the domestic situations considered by the decisions submitted as purported authority, and fails to establish a cohabitative relationship. The liaison between the parties in this matter was neither stable, enduring, nor substantial, and was not demonstrative of the traditional emotional securi-

ty obtained from family life. Although the *Dey* court pronounced that a "spacious" view should be utilized when considering family matters, the decision was never intended to encompass the fugacious type of relationship which developed herein.

The Court acknowledges that the dating relationship demonstrated in this case would satisfy the criteria necessary to obtain relief from an act of domestic violence by either party. However, a scrupulous examination of that conclusion, discerns that the determination herein, not to expand venue in the Family Part in the absence of cohabitation, is neither a paradox nor a conflict.

Initially, it is noted that the specific intent of the Prevention of Domestic Violence Act is to provide the maximum protection the law can structure to protect parties from domestic abuse. *N.J.S.A.* 2C:25–18. As a result, the interpretation of the Act has been determined to require great liberality when construing its terms. *See, Regan v. Regan,* 246 *N.J.Super.,* 473, 480, 587 *A.*2d 1330 (Ch.Div.1990), citing *Carr v. Carr,* 120 *N.J.* 336, 351, 576 *A.*2d 872 (1990)

The specific language of the Act referenced above is of even greater significance to the instant comparison. Under the prior Domestic Violence Act, parties who did not cohabit together were not entitled to relief. The current Domestic Violence Act initially provided a more liberal definition of a "victim," which included the term "household member". Even though the new reference was acknowledged to have a more comprehensive effect than the prior term of "family member," it was still determined to be insufficient to include a short term dating relationship, as justification for jurisdiction under the Act. *Desiato v. Abbott,* 261 *N.J.Super.* 30, 617 *A.*2d 678 (Ch.Div.1992). As a result, the Legislature amended the Act in 1994, to specifically provide coverage for parties who established a dating relationship, by including that language within the definition of a "victim." *N.J.S.A.* 2C:25–19 d.

The distinction of the criteria necessary to qualify for protection under the Domestic Violence Act and to establish venue in the Family Part, is therefore apparent and substantial. By juxtapos-

ing the language in each reference, it becomes obvious from the absence of language referencing a dating relationship in the venue rule, that there is a pellucid distinction between the two concepts.

A final, but compelling consideration which militates against expanding the venue concept, is the potential effect on the calendar of the Family Court, and the concomitant constriction of the ability to deal with the sensitive and important areas presently contained within the purview of the Rule. The "scimitar" which extends ominously over each Family Court Judge is the extensive nature of the current schedule, which has caused our Supreme Court to describe them as "already heavily burdened". *Brennan v. Orban,* supra at 304, 678 *A*.2d 667 (1996). As also observed therein:

> In addition, the workday of the Judge requires ever present readiness to clear the courtroom to attend to the many emergent matters that arise in the family part including juvenile matters and the enforcement of the Prevention of the Domestic Violence Act... *Id.* at 302, 678 *A*.2d 667.

Since the passage of the Prevention of Domestic Violence Act in 1991, the number of actions filed on a statewide basis in New Jersey has grown from 36,054 to 61,604 in 2000.[3] The Appellate Division characterized the increase in the domestic violence caseload as "burgeoning" more than four years ago. *Smith v. Moore,* 298 *N.J.Super.* 121, 123, 689 *A*.2d 145 (1997 A.D.). As a consequence of the "Adoption and Safe Families Act of 1997," 42 U.S.C.A. 671(A)(15) (effective 1998), implemented in New Jersey by the Comprehensive Child Abuse Prevention and Treatment Act, *N.J.S.A.* 9:6–8.83 through 9:6–8.106, an increase has occurred in statewide Family Part filings to terminate parental rights from 674 in 1998 to 1,141 in 2000.[4] The recent adoption by the New Jersey Legislature of the Kinship Legal Guardianship Legislation, *N.J.S.A.* 3B:12A–1 to 6, *N.J.S.A.* 30:4C–84 to 88 (effective 2002), can only result in a further expansion of filings in this particular

---

[3] AOC Superior Court Caseload Reference Guides 1991–1996, 1996–2000

[4] *Id.*

area. Finally, it is also noted that the statewide total for complaints filed in the Family Part seeking marriage dissolutions surpassed 60,000 for the first time in 2000.[5]

Family Part Judges are the successors to those "courts of conscience" who have always administered justice to the citizens of New Jersey. *Brennan,* supra at 304–5, 678 *A.*2d 667. As one judicial commentator has observed "Upon consideration of the importance and volume of the cases presented, together with the emotional atmosphere of the court, family court judges are exposed to the heaviest judicial workload." *Juvenile & Family Court Journal,* (1993) *Family Courts: An Effective Judicial Approach,* by Judge Robert W. Page.

Family Court Judges should devote their time and attention to the comprehensive and meaningful problems generated by family or family-type situations, not seasonal dating relationships. The role of a Family Court Judge should not be attenuated in order to address property disputes which are not predicated upon, or ancillary to, a principal claim which conforms to the venue requirements of Rule 4:3–1(a)(3).

A careful review of the relief sought by the Plaintiff indicates that the claims are not primarily derived from the traditional concepts addressed in the Chancery Division. Succinctly stated, the Plaintiff seeks return of monies by way of reimbursement or damages due to the conduct of the Defendant. Since the principal relief sought is legal in nature, the matter will be transferred to the Law Division pursuant to Rule 4:3–1(b), and proceed to trial in that venue.

---

[5] *Id.*