812 A.2d 435 (2002)
356 N.J. Super. 342
Peter BANACH, Plaintiff,
v.
Jamie CANNON, et al., Defendants.
Superior Court of New Jersey, Chancery Division, Monmouth County.
Decided June 24, 2002.
*436 Robert L. Witek, II, Long Branch, for plaintiff, (Resnikoff, Resnikoff & Witek, attorneys).
James W. Miskowski, Ridgewood, for defendants John and Marie Cannon.
No other appearances.
FISHER, P.J.Ch.
Plaintiff Peter Banach ("Peter") claims he fathered a child about to be born to defendant Jamie Cannon ("Jamie"). Because the constitutional rights of unwed fathers have not been viewed expansively, and prompted by Peter's inability to locate Jamie or learn the status of her pregnancy, the potential for immediate and irreparable injury to Peter's nascent rights warrants a mandatory injunction compelling defendants' turnover of relevant information.
The facts are simple andsince no defendant has provided any sworn statements or other admissible information rather one-sided. Peter, by way of his verified complaint and other certifications, contends a pregnancy resulted from his relationship with Jamie. "Shocked and happy" about this news, Peter and Jamie "agreed to raise the child and be the best parents [they] could be." However, according to Peter, once Jamie's parents learned of the pregnancy, his relationship with Jamie, against his wishes, ended. Prior to their break-up, Jamie told Peter that "she was thinking of giving the child up for adoption." Since that time, Peter has been unable to communicate with Jamie and is no longer able to locate her. Motivated by the imminent birth, his lack of information as to Jamie's whereabouts, and Jamie's apparent intention to surrender the child for adoption, Peter seeks an injunction prohibiting the "implementation" of an "adoption plan," compelling the turnover of information as to Jamie's whereabouts, and any other relief which may be just and equitable under the circumstances.

I
To the extent that Peter seeks an injunction against the commencement of an adoption proceeding, the limits of R. 4:52-6 should be considered:
No injunction or restraint shall be granted in one action to stay proceedings in another pending action in the Superior Court, but such relief may be sought on counterclaim or otherwise in the pending action.
The rule obviously pertains only to the granting of relief in one action inhibiting the proceedings in "another pending action." *437 No other action is presently pending anywhere. The question, then, to which R. 4:52-6 does not speak, is whether a court of equity may restrain the commencement of a lawsuit.
Traditionally, an injunction against the commencement of another suit may issue upon "equity and good conscience." In Bigelow v. Old Dominion Copper, 74 N.J.Eq. 457, 462, 71 A. 153 (Ch.1908), Chancellor Pitney described this authority:
The court of equity ... acts in personam, and it is immaterial whether the threatened inequitable conduct is to be carried on within or without the limits of the jurisdiction.
But on general principles, equity will not interfere with the right of any person to bring an action for the redress of grievancesthe right preservative of all rightsexcept for grave reasons, and on grounds of comity the power of one state to interfere with a litigant who is in due course pursuing his rights and remedies in the courts of another state ought to be sparingly exercised. The courts of New Jersey ought not to assume, directly or by indirection, any appellate jurisdiction over the courts of Massachusetts, nor proceed in giving judgment here upon the idea that the courts of that commonwealth are in the least degree incompetent or unwilling to do full and complete justice in all cases that are fairly within their jurisdiction. [Id. at 473, 71 A. 153 (citations omitted)]
As can be seen, while the power exists, it should be exercised only upon the "gravest" of circumstances and, while the injunction's effect may even extend beyond state lines, care should be taken to insure that the order does not extend beyond what is required to prevent irreparable injury. The court also must be careful that in protecting a plaintiff's rights by issuing such relief it does not unnecessarily limit any affected parties' free access to courts. See, e.g., McKeown-Brand v. Trump Castle Hotel & Casino, 132 N.J. 546, 561-62, 626 A.2d 425 (1993) ("in a democratic society, citizens should have ready access to all branches of government, including the judiciary").
This court, at present, need not issue an order so broad in scope as sought. Since there is a lesser remedy which, for the present, appears sufficient, the court need not now take the more drastic step of enjoining any future litigation.

II
Additional care is required so that in granting relief to Peteras a means of protecting the rights he claimsJamie will not be unnecessarily barred from exercising any corresponding rights she possesses.[1] That is, while Peter would seek this court's aid in protecting any right he may have in securing a role in the child's life, he would also appear to have this court bar Jamie's right (if that is what she *438 seeks) to terminate any further involvement she could have with the child. If this court is to give protection to any nascent parenting right which Peter may have, it should not do so at the deprivation of Jamie's right to give up any parenting right she may have.
Courts of equity must tailor the scope of their injunctions so they will be only so broad as necessary to protect the object in question. R. 4:52-4 ("Every order granting an injunction and every restraining order ... shall be specific in terms"). Everything about the power to enjoin, that it is "the strongest weapon at the command of a court of equity," suggests "caution, deliberation and sound discretion," Light v. National Dyeing and Printing Co., 140 N.J.Eq. 506, 510, 55 A.2d 233 (Ch.1947), all of which bespeak a narrowing of its terms to meet only the matter at hand. There isin treating the application with such trepidation and also with common sense and a need, in this case, to vindicate fundamental human rightsno reason to believe that Peter's interests cannot be protected by injunctive relief less drastic than that sought. In other words, there does not appear to be any reason why Jamie cannot take such steps as she wishes with respect to terminating her parental rights so long as Peter's right to preserve his alleged parental rights, whatever they may be, is not destroyed in the process.
The seminal purpose of the power to enjoin, in such circumstances, is the preservation of rights pending the resolution of disputes at a full and fair hearing. Peters v. Public Service Corp. of N.J., 132 N.J.Eq. 500, 511, 29 A.2d 189 (Ch.1942), aff'd, 133 N.J.Eq. 283, 31 A.2d 809 (E. & A.1943). This is the polestar which guides the court in examining Peter's claim and the opposition to it.

III
It is important to recognize that this action, despite its link to issues more commonly heard in the Family Part, is rightfully venued in General Equity. This venue choice also reflects on the nature of the relief sought as well as that which will be granted.
While adoption proceedings, as well as any other litigation involving families or family-type relationships, should be venued in the Family Part, see, N.J.S.A. 9:3-42[2]; R. 4:3-1(a)(3),[3] no such cause of action has yet ripened into a justiciable controversy because the child has not yet been born. And, because there are no other accouterments which would generate a basis for a Family Part action at this time, the present cause of actionseeking mandatory injunctive relief to preserve a claim now only gestatingwould appear to most appropriately lie in General Equity. Accordingly, in ascertaining the nature of the present suit and the propriety of granting relief, it must be understood that the matter in questionin this suitis quite limited. That is, this court's role is not to resolve what should be done about the parties' relationships with the anticipated child. The court's role is only to preserve those gathering rights. Thus, the court may craft and issue an appropriate remedy to protect the destruction or impairmenta of Peter's nascent rights to institute or participate in any such future Family Part action. Indeed, despite defendants' "sky is falling" view that such *439 relief is extraordinary and drastic and will crack the foundations of the court house, it is not unusual for a court of equity to grant an equitable remedy to protect the res of an existing or anticipated lawsuit or proceeding elsewhere.
The present action should also not be viewed as an usurpation of the Family Part's expertise in family disputes. Rather, the court seeks to preserve these budding disputes for the Family Part in whom the Legislature, see, N.J.S.A. 9:3-42, and the Supreme Court, see, R. 4:3-1(a)(3); Brennan v. Orban, 145 N.J. 282, 301, 678 A.2d 667 (1996), have entrusted the ultimate decisions as to the continuation or destruction of the relationships any of these parties may have with the child whose arrival is imminently anticipated. Accordingly, the present matter is akin to the problems encountered in Ortho Pharmaceutical Corp. v. Amgen, Inc., 882 F.2d 806, 812 (3d Cir.1989)[4] and Steiger v. Armellino, 315 N.J.Super. 176, 716 A.2d 1216 (Ch.Div.1998),[5] where the power to preserve the res of future litigation to occur in different courts or tribunals was recognized. Because the child has not yet been born, there is no basis for the resolution of the present problems in the Family Part. Peter would appear to have no alternative venue for the preservation of his inchoate rights other than General Equity.[6] Once the child is born and either an adoption proceeding or other case for custody, support or other possible remedies is commenced, then venue will undoubtedly be lodged in the Family Part and the need for this court to participate further will have ended.

IV
It is clear, notwithstanding defendants' attempts to exalt Jamie's right to privacy,[7] that Peter simply seeks to preserve any future disputes the parties may litigate in the Family Part and that, in preserving those rights, there need not be any extensive intrusion on Jamie's desire to be let alone. Peter seeks no more than to avoid becoming the next Jonathan Lehr.[8] Considering how the New York courts and the Supreme Court of the United States declined to preserve any opportunity Jonathan Lehr had to assert his rights in his biological child's adoption, Peter's alarm is well understood. This past is prologue to the present case.
Lehr had lived with the child's mother (Lorraine) for a short while but not at the time of Jessica's birth. As the majority opinion in Lehr emphasizedbecause they *440 are factors upon which the right to notice in an adoption proceeding hinged in New York's then statutory schemeLehr's name was not set forth on Jessica's birth certificate, he did not live with Lorraine after Jessica's birth, never provided any financial support, and never offered to marry Lorraine. Eight months after Jessica's birth, Lorraine married Richard Robertson. The Robertsons commenced an adoption proceeding in New York when the child was two years old. At or about the same time, Lehr commenced an action in the New York courts seeking a determination of paternity, an order of support, and visitation. As a result of discussions regarding the paternity action, Lehr's attorney learned of the adoption proceeding of which neither he nor his client were given prior notice. Four days later, Lehr's attorney telephoned the adoption judge seeking a stay until the paternity action could be resolved; he then learned the judge had signed an order for adoption earlier that day. All subsequent attempts to have the adoption order set aside failed in the New York courts,[9] causing Lehr to seek the Supreme Court's review of the matter and a consideration of his claims of federal equal protection and due process violations. Lehr was not the first opportunity the Supreme Court had to consider the extent to which an unwed father is entitled to due process concerning litigation involving his illegitimate child.[10] But, as is relevant to the present case, Lehr conjures a troubling spectre of Peter's future.
Lehr's essential holding unquestionably places an unwed father in a lesser position than the unwed mother:
the mere existence of a biological link does not merit equivalent constitutional protection, [although the] significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development. If he fails to do so, the Federal Constitution will not automatically compel a state to listen to his opinion where the child's interests lie. [463 U.S. at 261-62, 103 S.Ct. 2985]
Thus, while in the eyes of the Supreme Court the father's biological link is not sufficient to gain significant constitutional protection, the mother's biological link places her in a far superior position as to the immediate and future course of the child's interests and relationships for due process purposes.[11] Indeed, the Court in Lehr, relying upon an earlier decision, took a similar uneven view of the equal protection arguments, concluding that a state may not grant an unwed mother procedural rights in an adoption proceeding greater *441 than the unwed father only so long as that unwed father had "come forward to participate in the rearing of his child." 463 U.S. at 267, 103 S.Ct. 2985, quoting Caban v. Mohammed, 441 U.S. 380, 392, 99 S.Ct. 1760, 1768, 60 L.Ed.2d 297 (1979). There is no suggestion in these cases that the unwed mother needed to demonstrate that she participated in the rearing of the child.
The Court's last venture into defining the procedural rights of unwed fathers was Michael H. v. Gerald D., 491 U.S. 110, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989), in which a plurality of the court concluded the rights of an unwed father (the child was apparently fathered by one man, while the mother was married to another) were not entitled to federal constitutional protection because this "family" was not a type historically recognized in society. This truncated view of what limited filial rights must be protected by the states, compelled Justice Brennan to proclaim, in dissent, a view which would appear to accord more with the view of this State's highest court:
the plurality ignores the kind of society in which our Constitution exists. We are not an assimilative, homogeneous society, but a facilitative, pluralistic one, in which we must be willing to abide someone else's unfamiliar or even repellent practice because the same tolerant impulse protects our own idiosyncracies.
Even if we can agree, therefore, that "family" and "parenthood" are part of the good life, it is absurd to assume that we can agree on the content of those terms and destructive to pretend that we do. In a community such as ours, "liberty" must include the freedom not to conform. The plurality today squashes this freedom by requiring specific approval from history before protecting anything in the name of liberty. [491 U.S. at 141, 109 S.Ct. 2333]
This appears far more in accord with the broad view of "family" announced by our Supreme Court in V.C. v. M.J.B, 163 N.J. 200, 748 A.2d 539 (2000).[12] Accordingly, it may be anticipated that New Jersey law might provide greater rights than the United States Supreme Court was willing to protect as a matter of federal constitutional law.
But the question persists: should Peter have to risk whether he will be given an opportunity to be heard against the backdrop of this uncertain legal landscape? The limited scope of the United States Supreme Court's defining of the constitutional dimensions of the problem, rendered further troubling by the Court's silence on the subject since 1989,[13] lies at the heart of Peter's need for injunctive relief.
*442 The Supreme Court's relegation of the unwed father's biological link is further demonstrated through a further consideration of Lehr. The facts unmentioned by the Lehr majority but highlighted in Justice White's dissenting opinion warrant consideration:
Lehr visited Lorraine and Jessica in the hospital every day during Lorraine's confinement. According to Lehr, from the time Lorraine was discharged from the hospital until August, 1978, she concealed her whereabouts from him. During this time Lehr never ceased his efforts to locate Lorraine and Jessica and achieved sporadic success until August, 1977, after which time he was unable to locate them at all. On those occasions when he did determine Lorraine's location, he visited with her and her children to the extent she was willing to permit it. When Lehr, with the aid of a detective agency, located Lorraine and Jessica in August, 1978, Lorraine was already married to Mr. Robertson. Lehr asserts that at this time he offered to provide financial assistance and to set up a trust fund for Jessica, but that Lorraine refused. Lorraine threatened Lehr with arrest unless he stayed away and refused to permit him to see Jessica. Thereafter Lehr retained counsel who wrote to Lorraine in early December, 1978, requesting that she permit Lehr to visit Jessica and threatening legal action on Lehr's behalf. On December 21, 1978, perhaps as a response to Lehr's threatened legal action, [the Robertsons] commenced the adoption action at issue here. [463 U.S. at 269, 103 S.Ct. 2985]
Not only did the record demonstrate Lehr's extensive attempts to engage in a relationship with Jessica, but, when the adoption proceeding was commenced and, then, concluded, the Robertsons well knew that Lehr's parentage and visitation action was pending and they well knew of Lehr's whereabouts. They simply chose not to provide him with notice of the adoption action. Quite simply, the majority's view in Lehr supported the fact that concealment and other surreptitious conduct could serve to defeat an alleged biological father's right to be heard, apparently diminishing its earlier pronouncement that "[a] parent's interest in the accuracy and justice of the decision to terminate his or her parental status is ... a commanding one." Lassiter v. Department of Social Services, 452 U.S. 18, 27, 101 S.Ct. 2153, 2160, 68 L.Ed.2d 640 (1981).
The present case does not require this court's consideration of Lehr's impact and the other authorities cited as they might apply in ascertaining the scope of New Jersey law. It perhaps suffices to say that Lehr involves the Supreme Court's understanding of New York law and whether New York's laws violated the federal equal protection and due process clauses. Lehr has no impact and offers no binding precedent as to New Jersey's laws or the extent to which New Jersey's equal protection and due process clauses might afford greater rights.[14] Frankly, this court is *443 loathe to think that New Jersey's constitution and its courts would not provide greater protection to an unwed father than the New York courts and the Supreme Court of the United States deigned to give Jonathan Lehr. Indeed, it has not been uncommon for New Jersey courts to view New Jersey's constitutional guarantees of due process and equal protection more expansively than the Supreme Court has in construing the similar federal constitutional guarantees. See, e.g., Planned Parenthood v. Farmer, supra, 165 N.J. at 629, 762 A.2d 620; and numerous other examples cited in State v. Novembrino, 200 N.J.Super. 229, 240-43, 491 A.2d 37 (App. Div.1985), aff'd, 105 N.J. 95, 519 A.2d 820 (1987). See also, Brennan, "State Constitutions and the Protection of Individual Rights," 90 Harv. L.Rev. 489, 491 (1977), where Justice Brennan instructed that
state courts cannot rest when they have afforded their citizens the full protections of the federal Constitution. State Constitutions, too, are a font of individual liberties, their protections often extending beyond those required by the [United States] Supreme Court's interpretation of federal law.
Again, however, the concern is not so much whether Lehr or any of the Supreme Court's pronouncements in this field would ultimately be applicable or would be followed by a New Jersey family court for purposes of defining New Jersey law, but whether Peter should have to unnecessarily risk that possibility. Peter simply seeks an opportunity to have the relationship with the expected child that the Supreme Court of the United States has said he must demonstrate in order to gain some level of due process. It is a small thing he requests but its potential for harmand Lehr is the very embodiment of that potential and how it can generate into a very real and serious deprivation of a fundamental human rightis so grave that the limited remedy sought herein is required.

V
Perhaps Peter's concerns, as amplified above, are not as serious as they were in Lehr's day. Our Legislature has provided more adequate safeguards for unwed fathers. The Adoption Act unquestionably gives him a rightas an "alleged father" of the anticipated childto notice of any adoption action that may be brought in New Jersey. N.J.S.A. 9:3-45a requires that notice of such an action be given to "each parent of the child to be adopted." The word "parent" is defined so as to include "a putative or alleged biological mother or father of a child." N.J.S.A. 9:3-45a(2) (emphasis added). And, while the statute contains exceptions to the notice requirement, at least in the present circumstances, none of the exceptions for this notice requirement set forth in N.J.S.A. 9:3-45b is present here. Peter has "alleged" he is the father of the child that Jamie will soon deliver. That contention, alone, is sufficient to require that Peter be given notice of any later adoption proceeding at least until such time, if ever, that an exception contained in N.J.S.A. 9:3-45b may arise.
Moreover, while defendants contend that Peter can preserve his rights through the utilization of the procedures in the Parentage Actand should have no further rightsthis court greatly disagrees. While the filing referred to in N.J.S.A. *444 9:17-41b[15] may be a way in which Peter might be able to preserve his inchoate rights, there is no guarantee that defendants, who rather vociferously deny (although, without any opposing sworn statements) that Peter has any rights at all, might not seek to avoid the responsibilities thereafter placed upon them under these statutory schemes. Peter should not be left to rely upon the hope that defendants, who have demonstrated their hostility toward him and any rights or claims he seeks to preserve or prosecute, will provide him with any notice in the future. Peter seeks more and this court of conscience believes he should be provided with greater protection than that provided by the Parentage Act. While the Parentage Act might have created a remedy sufficient for Peter to assert his claim for future notice purposes, this court finds it appropriate to further insure his opportunity to be heard. As Justice White observed, in suggesting that the mere registry of Lehr's position with a governmental agency[16] was insufficient: "Lehr was entitled to due process, and the right to be heard is one of the fundamentals of that right, which `has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to appear or default, acquiesce or contest.'" 463 U.S. at 273, 103 S.Ct. 2985, quoting Schroeder v. City of New York, 371 U.S. 208, 212, 83 S.Ct. 279, 282, 9 L.Ed.2d 255 (1962) and Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950).
Indeed, it bears mention that the parties have argued what New Jersey law does or does not require. What if New Jersey law ultimately does not apply? What if Jamie is not in New Jersey? What if she has absconded from her home state and temporarily (or permanently) moved to a state without as an enlightened statutory scheme as New Jersey? Defendants, in responding to this application, have provided no assurance they will comply with their obligations under New Jersey law and have not provided any comfort that they will not engage in a scheme to avoid the jurisdiction of New Jersey's courts. As has been seen, the highest court in the land has expressed a limited view of due process in this setting notwithstanding, as in Lehr v. Robertson, the Robertsons' ambitious attempts to avoid the putative father and his rights. At best, the landscape created by the Supreme Court's past attempts to define the parties' rights have left nothing but confusion. See, n. 13, supra. Further, this confusion has contributed to a variety of approaches adopted by the states in defining the rights of unwed fathers. As one commentator has observed, the adoption laws "vary dramatically" among the fifty states, generating a malaise which inhibits any clear understanding among the public as to the rights attaching to parenting outside of wedlock: "This lack of uniformity in determining how to address unwed father controversies contributes greatly to a national sense of confusion and injustice." Resnik, Seeking the Wisdom of Solomon: Defining the Rights of Unwed Fathers in Newborn *445 Adoptions, 20 Seton H. Leg. Journal 363, 411 (1996).
This troubling environment, coupled with defendants' response to Peter's applicationwhich has been both hostile and, worse, silent, secretive and surreptitious as to the present circumstances and location of Jamieis the type of circumstance which will compel a court of equity to act.

VI
As mentioned in the margin, see, n. 1, supra, the exertion of the court's authority could have been avoided by an agreement which would allow Peter a chance to seek any remedies to which he would be entitled upon the child's birth. Defendants' utter refusal to discuss the matter and the assumed tactical decision of not having Jamie make an appearance in this action, demonstrate the validity of Peter's extreme distrust.[17] Considering the factual record (which exhibits a lack of dispute of Peter's version of events), and the surrounding, unsettled legal setting, the court feels compelled to grant relief as a means of preservingnot decidingthe ultimate issues.
As noted, only the parents of Jamie Cannon have appeared in opposition to the application. That, undoubtedly, was a tactical decision made by Jamie's parents and their counsel. Of course, the problem with that strategy is that it limits the issues which Jamie's parents have standing to raise. They initially claim that Jamie has privacy rights which would be invaded by a grant of the relief sought. That issue is for Jamie to raise, not her parents. Indeed, Jamie's parents' only legitimate interest in this case relates to the particular claim against themthe compelling of information as to the location of their daughter.
Perhaps the court could adhere to the pretense that Jamie has not appeared in this case and merely view the opposition as having come only from Jamie's parents. It seems unlikely in the extreme that Jamie is not aware of this suit and any assumption to the contrary is to suggest this court's naivete.[18] Accordingly, the court is willing to consider the opposition to the application as extending to issues which only Jamie has standing to raise. To the extent that the court is in error in this regard, then the decision herein should be viewed as limited to a rejection of Jamie's parents' right to withhold information to this alleged father of Jamie's unborn child.[19] In this limited sense, Peter's *446 claim against Jamie's parents could be viewed as seeking an "equitable bill of discovery" which, while archaic in most instances because of modern discovery rules, would appear to have some legitimate office here. See, e.g., 1 Pomeroy's Equity Jurisprudence (1941), § 196 at page 292. Considering the nature of the facts at hand, this court of conscience concludes that the order which will be entered is an appropriate exercise of this court's equity jurisdiction as the claim applies only to Jamie's parents.
And, insofar as the order impacts upon Jaime and her privacy rights, it is a measured and careful intrusion justified by the facts and circumstances presented. The order which will be entered will extend no further than to require a flow of relevant information to Peter. He does not seek a resolution of his rights in relation to either Jaime or the child. He merely seeks the opportunity to litigate those issues. In short, as Peter argues, he will ultimately play by the rules, but he first needs the opportunity to get in the game or, as the lottery people say, "you've got to be in it to win it." An order which compels this information has little impact on any involved person's privacy rights.[20]
While there may be an absence of reported decisions justifying this court's entry of such an order, courts of equity exist for such situations. Briscoe v. O'Connor, 115 N.J.Eq. 360, 364-65, 170 A. 884 (Ch.1934); Brown v. Fidelity Union Trust Co., 10 N.J. Misc. 555, 558, 159 A. 809 (Ch.1932). As one commentator accurately observed:
This maxim [where there is a right, there is a remedy] is also found in the common law, but is more significant in equity because of the greater ability of equity to suit the remedy to the situation. This characteristic is the very basis of equity jurisdiction. Historically, it was the lack of appropriate remedies for certain rights that gave impetus to the rise of chancery. The interpretation of statutes and the provision of remedies where they do not exist are among the most important functions of equity jurisprudence. In brief, "where a legal relief is inadequate, or not full, equity will intervene." [Oleck, "Maxims of Equity Reappraised," 6 Rutgers L.Rev. 528 (1952)]
Whenever a legal right is infringed or may be endangered, or may not adequately address a concern which has arisen, a court of equity may grant appropriate relief. See, e.g., Crane v. Bielski, 15 N.J. 342, 349, 104 A.2d 651 (1954). Courts of equity are not restricted to issue only known remedies. Rather, courts of equity and their remedies
are distinguished for their flexibility, their unlimited variety, their adaptability to circumstances and the natural rules which govern their use. There is in fact no limit to their variety in application; the court of equity has the power of devising its remedy and shaping it so as to fit the changing circumstances of every case and the complex relations of all the parties. [Sears Roebuck & Co. v. Camp, 124 N.J.Eq. 403, 411-12, 1 A.2d 425 (E. & A.1938) ]
The present situation cries out for the issuance of such a flexible remedy.

*447 VII
Keeping with the notion that Peter is entitled to a flow of information in order to preserve his right to litigate in the future, the court will enter an order which allows appropriate opportunities for Peter to gain information about the soon-to-be-born child. This order will only moderately interfere with the claims regarding Jamie's privacy and does not at all interfere with her right to make whatever lawful choices she may choose regarding her own parental rights. Further, becauseonce the child is bornany future disputes should be resolved in the Family Part, the life of this court's intervention will be brief indeed.
An appropriate order, compelling defendants to provide information as to Jamie's whereabouts, the birth of the child, and other relevant information, has been entered.
NOTES
[1] In opposition, defendants seem particularly concerned about the potential that any order from this court will be used by Peter to "control" Jamie or interfere with her rights. The court shares that concern and, indeed, has invited (and continues to invite) defendants to engage in a discussion about the terms of an order or private agreement which would provide Peter with information about the soon-to-be-born child and notice of any action which Jamie may wish to take regarding the child, while still providing defendants with privacy and freedom of choice. However, counsel for defendants has studiously avoided any such reasoned discussion or to recognize that Peter has any right to any information presently sought and, thus, to the extent that the court's order may unintentionally cut too wide a swath, defendants need only consider their own feckless impatience and unwillingness to engage in a free discussion of the matter.
[2] "An action for adoption shall be instituted in the Superior Court, Chancery Division, Family Part."
[3] "All civil actions in which the principal claim is unique to and arises out of a family or family-type relationship shall be brought in the Chancery Division, Family Part."
[4] In Ortho, the court recognized its power to issue injunctive relief in anticipation of an arbitration proceeding. 882 F.2d at 812.
[5] In Steiger, the transfer of funds was restrained in a General Equity action during the pendency of a fee arbitration pursuant to R. 1:20A. 315 N.J.Super. at 182-84, 716 A.2d 1216.
[6] Compare Dey v. Varone, 333 N.J.Super. 616, 756 A.2d 652 (Ch.Div.2000) with Larocco v. Gardella, 352 N.J.Super. 234, 799 A.2d 742 (Ch.Div.2002). Since it is alleged that Peter and Jamie had only a dating or sexual relationship and never lived together or engaged in any other more extensive relationship which might be equated with a "family" or "family-type" relationship, this case appears more similar to Larocco than Dey. This relationship, of course, will be viewed differently for venue purposes upon the birth of the child. But, again, the present proceedings are not intended to extend so far.
[7] Jamie's parents, the only defendants to appear in opposition to Peter's application, do not cite any authority which would suggest that they have standing to raise this contention. Jamie's right to privacy would appear to be only her argument to raise, not her parents.
[8] Lehr v. Robertson, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983).
[9] In the Matter of Jessica "XX", 54 N.Y.2d 417, 446 N.Y.S.2d 20, 430 N.E.2d 896 (1981), affirming, 77 A.D.2d 381, 434 N.Y.S.2d 772 (1980), affirming, 102 Misc.2d 102, 423 N.Y.S.2d 378 (1979).
[10] For example, in Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), the Court found a due process violation in a statutory scheme which conclusively presumed every father of a child born out of wedlock to be a person unfit to have custody of the child. See also, Quilloin v. Walcott, 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978); Caban v. Mohammed, 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979).
[11] It is important in this regard to distinguish between the rights of the parties' during pregnancy and after. The court's comments regarding the unequal positions staked out for these parties by the highest court in the land is directed only toward their positions after the birth of the child.
[12] See, especially, Justice Long's concurring opinion in V.C.: "... the nuclear family of husband and wife and their offspring is not the only method by which a parent-child relationship can be created. The values attached to family life, although properly attributed to the nuclear family model, can exist in other settings, including families created by unmarried persons regardless of their sexual orientation. In the final analysis it is reality and not mere legality that should dictate who can be denominated as a psychological parent." 163 N.J. at 234, 748 A.2d 539.
[13] See, Clark, The Law of Domestic Relations in the United States (2d ed., 1988), § 20.2 at 858 ("The Supreme Court has attempted on four subsequent occasions to clarify some of the issues raised by the Stanley case but has succeeded only in compounding the confusion"); Korn, "The Struggle for the Child: Preserving the Family in Adoption Disputes Between Biological Parents and Third Parties," 72 N.C. L.Rev. 1279, 1306 (1994) ("The question of whose interests will be protected in the future, however, remains unanswered. The five unwed father cases ... have left the Supreme Court, as well as state courts, with the ability to deny unwed fathers and other parental figures protection in their family relationships").
[14] Article I, Paragraph 1 of the New Jersey Constitution"[a]ll persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness"has been viewed, despite the absence of the phrases "equal protection" and "due process," as including those guarantees. See, State v. Baker, 81 N.J. 99, 114, 405 A.2d 368 (1979) ("[e]ncompassed within [Art. I, ¶ 1] is the requirement of due process"); Planned Parenthood v. Farmer, 165 N.J. 609, 629, 762 A.2d 620 (2000) (Art. I, ¶ 1 encompasses the right to equal protection of laws); Matter of Division of Criminal Justice State Investigators, 289 N.J.Super. 426, 437, 674 A.2d 199 (App.Div.) ("[a]lthough the phrase `equal protection' is not expressed in [Art. I, ¶ 1] ... it has been interpreted as protecting `against injustice and against the unequal treatment of those who should be treated alike'"), certif. denied, 146 N.J. 69, 679 A.2d 656 (1996).
[15] "The parent and child relationship between a child and ... [t]he natural father, may be established by ... a Certificate of Parentage as provided in [N.J.S.A. 26:8-28.1] that is executed by the father ... prior to or after the birth of a child, and filed with the appropriate State agency."
[16] New York maintained a "putative father registry." The existence of this registry and Lehr's failure to register proved fatal to his claim even though his claim of being Jessica's biological father and the pendency of his parentage suit were both well known to the Robertsons.
[17] In proceedings after the issuance of this opinion, regarding the enforcement of the court's injunction, the charade ended and Jamie did file an affidavit setting forth her contentions regarding her relationship with Peter and some of the information required by the court's mandatory injunction. A subsequent consent order resolved all remaining aspects regarding compliance with the injunction.
[18] Justice Holmes once said "judges are apt to be naif, simple-minded men, and they need something of Mephistopheles."
[19] And, to the extent the order imposes upon Jamie, it may be viewed as warranted by R. 4:52-1(a). This rule permits the issuance of temporary restraining orders without notice when "it appears from specific facts ... that immediate and irreparable damage will probably result to the plaintiff before notice can be served or informally given and a hearing had thereon." Here, while Jamie's parents have appeared and responded through counsel, raising for the most part issues only Jamie has standing to raise, it is fair to conclude that Jamie undoubtedly has received notice sufficient to allow for relief to be entered against her. But if we are to pretend that she is unaware of this suit, then the order which will be entered is every bit as justifiable as are restraining orders entered over fear that the res will be destroyed if notice were given. If Jamie is aggrieved by this action, she may immediately seek the order's modification or dissolution.
[20] In fact, after the issuance of the injunction, and in the midst of enforcement proceedings regarding that injunction, the revelation of Jamie's present location was resolved by her agreement to appoint her attorney as her agent for service of process of any Family Part suit which Peter may commence. As a result there will be absolutely no interference in her claim to privacy.